## Hester *et al.* *versus* The Commonwealth.

1. In 1869, H. was discharged from prison, where he had been confined on a charge of complicity in the murder of R. The indictment had been found at February term of that year, and when discharged the May term, the second after his arrest and imprisonment, had expired. Eight years thereafter H. was again indicted for the murder of R., and set up this discharge as a bar to the prosecution, claiming that he was entitled to the benefit of the "two-term rule," prescribed by the Act of 31st March 1860. It appeared from the record that immediately before the motion for the discharge the district attorney had asked leave to enter a *nolle prosequi* as to H., and that the entry was made at once. *Held*, that the record did not show a discharge under the two-term rule of the statute, and the entry of the *nolle prosequi* was not a bar to the second indictment.

2. A confessed accomplice in the murder was offered as a witness to fasten participation in the crime upon the prisoners. He was objected to on the ground that he had been convicted of larceny and his sentence had not expired. To meet this objection a pardon was offered, granted by the governor. Against this it was alleged that the rules of the board of pardons had not been observed and that the full sentence of the court had not been recited therein. The only omission was the direction for the restoration of the property stolen, or the payment of its value. *Held*, that the court was bound to accept the executive action as controlling and conclusive.

3. Against the same witness it was alleged that he had been convicted of highway robbery and sentenced, and subsequently discharged under the provisions of the Act of May 1st 1861. It was insisted that he was not competent to testify, because he had not complied with the terms of his sentence. Upon the production of the record it appeared that the trial had been in the Quarter Sessions and not in the Oyer and Terminer. *Held*, that as there was thus presented the record of a conviction in the Quarter Sessions, for a crime triable only in the Oyer and Terminer, the whole proceeding was a nullity and was properly disregarded.

4. Dougherty *v.* The Commonwealth, 19 P. F. Smith 286, followed.

5. The prisoners were charged with murder, which had followed a highway robbery, and it was proposed to prove that they were members of a secret society, that had for its object the commission of crimes, chiefly beatings, arsons, robberies and murders, and the protection of its members from arrest and punishment by secreting them, aiding their escape and otherwise. This evidence was offered to show an extensive organization of conspirators to commit crime, having the robbery and murder charged within the general scope of the conspiracy, as well as tending to show opportunity, means, preparation and disposition on the part of the prisoners to commit the crime in question, and to explain and corroborate other testimony, in regard to the arrangement for the commission of said crime. The court below ruled that the Commonwealth might prove the fact of the membership of the prisoners in such organization, confining the testimony to facts that existed at the time of the murder. *Held*, that this evidence was clearly competent to the extent to which it was admitted.

6. *Held*, further, that for the same reasons it was relevant to prove that the place where these prisoners met was a common resort of the members of this secret organization.

7. The court below charged the jury that the testimony of an accomplice, before it is accepted as true, should be corroborated by unimpeachable testimony in some material part which affects the prisoner on trial and connects him with the offence, but it is not necessary that the corroboration be by direct testimony; it may be by such circumstances as satisfy the jury of the fact: *Held*, that this instruction was proper.

8. Where the questions put to a witness on cross-examination are as to

[Hester *v.* Commonwealth.]

matters which are not connected with the cause or the parties, they come within the rule of collateral matter and are not subject to contradiction.

9. Statements made by a prisoner to outside parties in relation to his return home and surrender to the officers of the law, cannot be made evidence on the principle of *res gestæ.*

10. Where an attempt is made to discredit the statement of a witness, evidence is admissible to show that he had previously made a similar statement to other parties, not to show that the statement is true, but that it is not a fabrication of recent date.

October 2d 1877.   Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Oyer and Terminer of *Columbia county:* Of May Term 1877.   Certified from the Middle District.

Indictment of Patrick Hester, Peter McHugh and Patrick Tully, for the murder of Alexander W. Rea.   The defendants were jointly indicted on the 7th of February 1877.   McHugh and Tully each pleaded, "Not guilty," and Hester filed a special plea, which set forth that in December 1868 he was arrested for the murder of Rea, and confined in the county jail; that while so confined he was indicted for said felony; that during the period of his confinement the February and May terms of the Court of Oyer and Terminer were held, and he was not called for trial; that on the 11th of May 1869, being the last day of the second term, he was duly discharged from imprisonment for the murder of said Rea; wherefore he prayed judgment of the court if he should be again charged with the same felony and murder of which he has once already been acquitted and discharged.

The district-attorney filed a replication, wherein he averred that the time of the court at the February and May terms in 1869, was occupied with the trial of causes and other business; that the regular term of said court expired on the 8th of May 1869, and that on the 11th of May 1869 the district-attorney, by leave of court, entered a *nolle prosequi* as to the said Patrick Hester upon the said indictment, whereupon he was discharged from custody, and prayed that the record might be inspected in proof of these averments.

The court, Elwell, P. J., in ruling upon this special plea, said:—

" The record does not show that the prosecution was in fault for two terms in not bringing the defendant to trial on the former indictment.   There was no court held in March 1869, and the business in the court at the May sessions 1869 precluded the possibility of trial at that term unless other trials had been postponed in order to give preference to the case of defendant.   The record does not show that the defendant was discharged under the two-term provision of the statute.   The discharge on the 11th May 1869 was merely a judgment that, as the district-attorney had entered a *nolle prosequi,* the defendant was entitled to be discharged from imprisonment.   The discharge under these circumstances is not a bar to another prosecution for the offence charged in the then

[Hester v. Commonwealth.]

pending indictment: 1 Whart. Crim. Law, § 545; 1 Bishop on Crim. Law 859. Upon inspection of the record I am, therefore, of opinion that the plea of the defendant is not sustained, and he is required to plead over to the indictment now pending."

Hester then pleaded, "Not guilty," and the trial proceeded; and from the evidence the following facts were disclosed:—

Rea resided at Centralia, and was superintendent of the Locust Mountain Coal and Iron Company. On the morning of the 17th of October 1868 he left his house, in his usual health, and started to go to Mount Carmel. He was seen in his buggy alone, on this morning, driving towards the Coal Ridge Colliery. Not returning in the evening, search was made for him by citizens of Centralia, and on the following morning his body was found on the right side of the road leading from Centralia to Mount Carmel, not far from a place known as the "Water Barrel," in a clear spot, with brush all around it, and a path leading to it. The body was found lying upon its back with the face turned up. There were six pistol wounds on the body, five of which were mortal. One wound was in the face, three in the body, apparently fired from the front; one in the neck, and one at the base of the skull behind the ear. No watch or money, except a few copper coins, were found on the body. Several men were seen near the "water barrel," a short time before the deceased would have reached there after leaving Centralia—that is, between 9 and 10 o'clock in the morning. The theory of the Commonwealth was that, as this Saturday was the general pay-day in the coal regions, these men had concealed themselves at this point for the purpose of securing the money with which Rea was going to pay the hands at the colliery, and that they had stopped him on the road, robbed and killed him.

The Commonwealth offered Daniel Kelly, a confessed accomplice in the murder of Rea, as a witness, and the defendants first objected on the ground that he had been convicted of larceny in the Quarter Sessions of Schuylkill county, and sentenced on the 10th of November 1874, to an imprisonment of three years to separate and solitary confinement at hard labor, and that this sentence had not expired. To meet this objection the Commonwealth produced a pardon granted by the governor on the 6th of January 1877. In reply the defendants offered to show that this pardon was not obtained at a regular meeting of the Board of Pardons, on the day fixed by the rules of the Board of Pardons, but at a special meeting, of which no notice was given; that notice was published by the Board of Pardons that no regular meeting would be held on the 2d day of January 1877, the regular day of meeting by the board, and the day when Kelly, or some one for him, gave notice he would apply to the board for a pardon.

This was to show that the pardon was void, having been given without a public hearing or notice, in violation of the rules of the board and the Constitution of Pennsylvania.

[Hester *v.* Commonwealth.]

And further, to show by the original papers on file that the Pardon Board did not certify that there was any meeting to consider the application of Daniel Kelly, or that there was any notice of a meeting; and that the recommendation to the governor is not an unqualified recommendation to pardon said Kelly; and that the hearing, recommendation, and all proceedings relating to the pardon, are in violation of the rules of the board established by themselves to govern those applying for and desiring to resist applications for pardon.

The Commonwealth rejoined:

1. That the pardon certificate in evidence states that the proper members of the Board of Pardons recommended in writing the pardon, after full hearing upon public notice and in open session, with the reasons therefor; and that it is not competent for this court on this offer to hear any evidence that proposes to contradict any of these statements.

2. The question of the validity of this pardon, for reasons not apparent on the face of the pardon, cannot be raised by these prisoners in this proceeding.

The court said:—

" While a pardon by the governor remained unrevoked by proceedings on the part of the Commonwealth, it must be considered as a valid charter. The recitals therein contained are conclusive on all persons but the Commonwealth. The offer of evidence by the defendant is not admissible in this collateral proceeding and is therefore rejected."

Defendants' counsel further objected to the pardon offered in evidence to render Daniel Kelly competent as a witness, for the reason that the pardon did not recite the same sentence as that contained in the record of the case of the Commonwealth *v.* Daniel Kelly, offered in evidence by the defendants.

The only difference was, that the direction for the restoration of the property stolen, or the payment of its value, was omitted. This objection was also overruled.

Another objection was made to the competency of Kelly, on the ground that on the 8th of September 1869 he was convicted of highway robbery and sentenced to imprisonment for two years. On the 7th of July 1871, he was discharged from custody, under the provisions of the Act of 1st May 1861, and it was argued that he was not competent to testify, because he had not complied with the terms of his sentence. Upon the production of the record of conviction, it appeared that the trial had been in the Quarter Sessions and not in the Oyer and Terminer of Schuylkill county.

The court held that the proceedings were *coram non judice*, and in overruling the objection to the competency of the witness said:—

" Upon objection to the competency of Daniel Kelly the court

permitted the counsel for defendants to bring in the record of conviction of the witness for robbery in Schuylkill county. The exemplified copy of the record is from the Court of Quarter Sessions of that county. It shows that Dennis Kelly, who is shown to be the witness, was indicted in the Court of Oyer and Terminer of Schuylkill county, on the 7th September 1869, for highway robbery, and that he was tried in the Court of Quarter Sessions, on same day, found guilty and sentenced to pay a fine of one hundred dollars and costs and undergo imprisonment for ten years in Schuylkill county prison. The record itself is produced and appears to be the docket of the Quarter Sessions. It is testified by the clerk that there was an Oyer and Terminer docket kept in that county, in which were entered homicide trials, also for burglary and the like. In the case of Dougherty v. Commonwealth, 19 P. F. Smith 292, which was a writ of error to Armstrong county, directed to the Oyer and Terminer and Quarter Sessions, it appeared that no separate docket was kept in the Oyer and Terminer, and the Supreme Court held, that as the record purported to be the record of the Quarter Sessions it must be so regarded and treated. The indictment was for murder. It was said, per WILLIAMS, J., "the court of Quarter Sessions therefore had no jurisdiction or power to try and punish the defendant, and if as appears by the record, he was tried, convicted and sentenced therein, the whole proceedings must be regarded as null and void. If the case had been in fact tried in Oyer and Terminer, the record might have been corrected by an order of the court, *nunc pro tunc*, as was afterwards permitted in the case cited, and as was done in Brown v. The Commonwealth, 28 P. F. Smith 122. But until such amendment or change is made the record must be taken as it stands and cannot be supplemented by parol evidence. No part of a judgment can rest on parol: Zimmerman v. Briggans, 5 Watts 1866. Inasmuch as the record of a court is to be taken as importing absolute verity, it cannot be shown by parol that it is the record of a different court from what it purports to be. There are other questions raised by the evidence in regard to the paying of the fine imposed and enduring the imprisonment for the time mentioned in the sentence. But as upon the whole showing I am of the opinion that the witness is not incompetent, I give no opinion upon these questions. The objection is overruled."

The action of the court in overruling these objections constituted the second and third assignments.

Kelly's testimony, as detailed by the court below, was substantially as follows: That the robbery and murder of Rea was planned on the night of the 16th of October 1868, at the saloon of Thomas Donohue, in Ashland, at the suggestion of Patrick Hester; that there were present at the conspiracy ten persons, viz: Patrick Hester, Peter McHugh, Patrick Tully, Ned Skivington, Bryan Campbell, James Bradley, William Muldowney, Roger Lafferty, Jack

[Hester *v.* Commonwealth.]

Dalton and himself; that its object was money—Hester informing the others that Rea would go to Bell's Tunnel the next day, and that there was money in it for them—$18,000 or $19,000; that the whole band had pistols, and that Lafferty provided powder and balls and loaded the pistols; that it was agreed to rob, but not to kill Rea; that they all staid in Donohue's saloon, drinking all night until nearly daylight, when all, except Lafferty, started out to meet Rea on the Mt. Carmel road, between Centralia and Mt. Carmel; that Muldowney left them, saying he was lame; that above the toll-gate Hester and Skivington left, Skivington saying that he would go to work in order to ward off suspicion, and Hester that he would go to Shamokin to buy hair to put in lime for plastering; that he there handed his pistol to Kelly saying, "Your pistol is no good, take mine for I know it is sure;" that the money was to be divided between eight of them; that the two others, for some reason, were to have no part; that they were all members of the Ancient Order of Hibernians, Hester being the body-master, whose orders, according to the practices among them, they were bound to obey; that the party of six arrived at the place known as the "Water Barrel" in the early morning and were concealed by the side of the road; that Dalton, being the only one of the party who knew Rea, went upon the road and was to give a signal by raising his hat after Rea had passed him; that they heard a wagon coming and went out by the side of the road, but as Dalton did not raise his hat they went back into the brush; that when Rea did come along they went out upon him, robbed him of his money, a gold watch, and a pocket book; that then witness moved over from where he stood and asked McHugh what they were to do about it, and McHugh said he was not going to be hunted around the world by any living man on earth, and then we cocked our pistols and both went off together, and then Rea ran, and McHugh had his pistol across his arm and kept firing at him; when he began to run McHugh followed him into the bush and kept cracking away at him while he was running, and Tully walked up to him and put the pistol to his ear and fired at him; that the party went upon the mountain and divided the $60 or $70 found in the pocket-book; that witness kept the watch and gave it to Michael Graham on the evening of the same day to keep for him, telling him it was Rea's watch; that he afterwards pledged it to Con O'Garragh for $10; that McGuire gave him $20 for the watch, and he paid the $10 to O'Garragh, who had been told by him before that it was the watch of Rea. He further said that he saw Hester on the night of the murder at Michael Graham's at a raffle; that Hester said the money was not worth dividing. He further testified that the day after, as he thinks, Thomas Donohue was arrested for the murder; that he, Jack Smith, Lafferty, Tully and McHugh, went to see Hester, and that Smith informed Hester of Donohue's arrest, when Hester replied, "it is

[Hester *v.* Commonwealth.]

near time that I should clear out," and that he left that night, and that the next night or two, the witness, Tully and McHugh left for fear of being arrested.

Kelly and other witnesses were then offered by the Commonwealth to prove that, at the time of the murder of Alexander W. Rea, and for years prior thereto, there existed in the coal regions of Schuylkill, Carbon, Luzerne, Columbia and Northumberland counties, an organization whose members were bound by obligations to secrecy, and who were known to and communicated with each other by signs and passwords; that such organization was subdivided into and made up of many minor organizations, called divisions, at the head of each of which was an officer called the president or body-master; that at the head of all the divisions for each county, and representing the whole for such county, was an officer known as and called the county delegate; that this organization was known as the Ancient Order of Hibernians and also as Mollie Maguires; that such organization had for its chief and main purposes the commission of crimes, chiefly beatings of others, arsons, robberies and murders; and also for the protection of its members from arrest and punishment for such crimes by means of secreting the criminals, aiding their escape, employment of counsel for their defence and false testimony to secure acquittals; that the practice and rules of the organization were and are, that the body-master selects members of the division of which such body-master is the head, to commit crimes, and that such members are bound to obey, on penalty of provoking personal violence and oftentimes death upon themselves; that Patrick Hester was the body-master for the division at Locust Gap, and the acting county delegate for Northumberland county at the time of the murder of Rea and for months prior thereto; that at the time of the murder of Rea, Patrick Hester, Patrick Tully, Peter McHugh, Manus Cull, Bryan Campbell, James Bradley, Jack Dalton, Ned Skivington, Wm. Muldowney and Alexander Lafferty, were each of them members of this organization or Mollie Maguires, of whom Patrick Tully, Peter McHugh, James Bradley, Ned Skivington and Alexander Lafferty were members of the division of which said Hester was body master; and also that Thomas Donohue was a Mollie Maguire, and his saloon at Ashland was the main rendezvous of the order at that place, and Michael Graham and Con O'Garrah were also members.

This evidence offered,

1. As showing an extensive organization of conspirators to commit crimes, including robberies and murders, such as the Rea robbery and murder, and having this robbery and murder within the general scope of the conspiracy.

2. As tending to show opportunity and means of prisoners for the commission of the crime in question, and also of their preparation and disposition to commit it.

4 NORRIS—10

[Hester *v.* Commonwealth.]

3. As explanatory and corroborative of the testimony of Daniel Kelly as to the nature of the consultation and arrangement to rob and murder Rea, at Donohue's saloon on the night of October 16th, and why the parties named by Daniel Kelly as the actual perpetrators would and did perpetrate this murder in question, and agreed to divide the fruits of the crime with Hester.

4. As bearing upon the question involved in the case, as claimed and shown by the Commonwealth, why so large a number of persons should have engaged in the murder of Rea, in daylight, upon a much-travelled public road, in a populous neighborhood, and that these circumstances suggest that the confederates were bound by extraordinary ties, and the existence of this organization explains these extraordinary ties.

Defendants objected, for the following, among other reasons :—

1. The offer is not only to show a criminal society in Northumberland county, but in Carbon, Schuylkill and Luzerne, and to show the criminal association and acts of parties not on trial here, for whose acts the prisoners are to be responsible in this case.

2. The evidence shows that the prisoners met at Ashland on the 16th of October 1868, without previous concert or arrangement, and that whatever was agreed to be done there was entered into voluntarily by those present as individuals strictly, and that the motive and purpose of such conspiracy was to obtain money.

3. The alleged criminal organization of which the prisoners are charged as being members, as appears by the evidence in this case, had no agency in this alleged conspiracy formed at Donohue's saloon.

The court overruled the objections and said :—

" I am of opinion that this offer is on the very outer verge of any evidence that has been offered in these trials, so far as I can discover. In the other cases they have brought in the action of the societies, as a society, in reference to matters on trial, but I am not prepared to say but what evidence of the character proposed is right and proper, perhaps, as explanatory of some of the evidence given by Kelly, which evidence, of course, must be corroborated before it is given any weight, and corroborated in the manner in which the law requires. I have come to the conclusion that the Commonwealth may prove the fact of membership on the part of the defendants in such an organization as that set forth in the offer, confining the testimony to facts that existed in October 1868, but it is not permitted to prove specific acts of others, members of the society, either before or since that time."

Overruling these objections constituted the fourth assignment of error.

The Commonwealth further offered to prove by Kelly that the saloon of Thomas Donohue was a place of meeting of the members of the society above alluded to, and to which he and the prisoners

belonged, to establish, first, a circumstance the tendency of which was to show why ten persons meeting casually at one place could enter into a conspiracy to commit a murder, and, next, as bearing upon the credibility of the witness.

The court overruled the objection to this testimony, which is the fifth assignment.

John Cannon, a witness, being on the stand, defendants offered to prove, for the purpose of contradicting and impeaching Kelly, a witness of the Commonwealth and a confessed accomplice, that soon after the Rea murder, about the time that Donohue was arrested, Daniel Kelly called upon the witness, John Cannon, and inquired of him if he would not swear to a lie in case he (Kelly) got into any difficulty, and that upon the refusal of the witness, Kelly denounced him as a mean man, and declared that he (Kelly) would swear to a lie at any time to benefit a friend.

Objection was made by the Commonwealth that no inquiry was made of Kelly as to any conversation that he had with the witness as to any matter connected with the Rea murder, or any anticipated difficulty of Kelly in relation thereto, and that any general inquiry, such as indicated in the offer, is as to collateral matter, and not the subject of contradiction by this witness.

The court sustained the objection, on the ground that the offer came within the rule of collateral matter, and that the defendants were bound by the answers of the witness.

Rejecting this offer was the sixth assignment.

To contradict Kelly and show the motive for Hester leaving the state, the defendants were allowed to prove that he apprehended arrest on a charge of adultery and of violating the laws of the United States against illicit distilling.　They further proposed to prove that Hester, while at La Salle, Illinois, heard that he was accused of the murder of Rea ; that when the rumor came he said he would go back home immediately ; to be followed by proof that he did go home, reaching there on Christmas day, or soon thereafter ; that he sent word to the authorities that he was at home, ready to be arrested ; that they did not come for him ; that he remained at home some little time after that, and finally, that he got a man to drive him over to Bloomsburg, and surrendered himself ; that he left home October 16th 1868, before any suspicion rested upon him, and with the knowledge of his family and fellow workmen, to visit his friends in Illinois.

This was offered for the purpose of rebutting the Commonwealth's evidence with regard to Hester's alleged flight.　And, secondly, of contradicting the testimony of Daniel Kelly.

The court sustained the objection to this testimony, saying that, " what Hester said in regard to his return, surrender, and all that, was not evidence."

This was the seventh assignment.

[Hester *v.* Commonwealth.]

One of the witnesses for the Commonwealth, Lewis Parr, a policeman who had charge of the cells of Donohue and Hester when confined in the Columbia county jail, in the spring of 1869, testified that he heard the following conversation between the two prisoners. Donohue, addressing Hester, said: "Pat, Pat, that was a poor go, killing Rea; wasn't it?" To which Hester replied: "It was so; and if I had to get him shot again, I would never do it;" and continued: "He is killed, and it is no use crying about it; but nevertheless, we are all right. I can, at any time, get from five to five hundred that will swear we were not there at the time."

E. R. Ikeler, who was district-attorney of Columbia county at the time Hester was awaiting his trial in 1869, had, while on the witness-stand, narrated a conversation with Parr which occurred shortly after this conversation between the two prisoners, when Parr had stated in substance the same language as above used. This testimony was objected to, but no exception was taken at the time. During the further progress of the trial, evidence was offered to impeach Parr's testimony, and then defendants' counsel moved to strike out Ikeler's testimony as mere hearsay. In ruling upon the motion, the court said: "That testimony was, perhaps, no evidence in chief in the first instance; but as it was given, we think it should not be stricken out now, because evidence was given tending to affect the testimony of Mr. Parr, as to whether the conversation which he narrated could have been heard; and this testimony of Mr. Ikeler is not evidence to prove the fact that it was so, but for the purpose, so far as it goes, and for whatever it is worth, of corroborating the testimony of Mr. Parr."

This was the eighth assignment.

Defendants offered to prove by John Traverse, a witness on the stand, that Kelly had robbed him of money. This was for the purpose of contradicting and impeaching Kelly, and for the purpose of explaining his motive in becoming a witness for the Commonwealth, and admitting himself a principal criminal in the case now on trial.

Objected to as being irrelevant and immaterial, and as to which defendants were bound by the answers of Kelly.

Objection sustained and ninth assignment.

Upon the question of the extent of credit to be given to the testimony of Kelly as an accomplice, the court, in the general charge, said:—

"In this case the Commonwealth has given direct and positive testimony, by the oath of an accomplice, that Peter McHugh and Patrick Tully were present at and assisted in the murder of Mr. Rea, and that Patrick Hester devised the plot and furnished in part the means for its execution. It is also claimed that the testimony of the accomplice is corroborated by facts and circumstances which entitle his testimony to belief. On the ground of public policy and of necessity, from its being scarcely possible to detect conspiracies

[Hester *v.* Commonwealth.]

and other great crimes without their information, the evidence of accomplices has always been admitted. They are competent witnesses, but the practice has been long settled that no conviction should be had upon the unsupported testimony of an accomplice. In fact his testimony ought always to be received with great jealousy and caution, for upon his own confession he stands contaminated with guilt. He admits participation in the crime which by his evidence he would fix upon the prisoners. His character is tainted and he may have strong and unadmitted motives to deceive. The testimony of an accomplice, before it is accepted as true, should be corroborated by unimpeachable testimony in some material part which affects each individual prisoner on trial, and connects him with the crime.

" This confirmation may be either by direct testimony or by such a chain of circumstances as clearly tend to support the testimony of the accomplice. Confirmation merely as to the circumstances of the felony is not confirmation at all. His narrative of what transpired at the time of the commission of the offence, and of the part which he took in it, and how it was accomplished, may be true, without involving the prisoners in any share of the offence; but it is not necessary that an accomplice should be corroborated as to all material facts. If he is corroborated in any of the material facts as to the participation of the prisoners, more is not required; and if he is thus confirmed, and if the jury believe his testimony, they may act upon it. Whether he is so confirmed by the evidence is a question which the jury are to determine. Corroboration as to one of the prisoners is not corroboration as to the others. Some confirmatory evidence must be given that an accomplice speaks the truth as to all, otherwise the corroboration cannot be considered as extending to all, but only to the one or more to whom it applies."

The verdict was murder in the first degree, and the prisoners were severally sentenced to be hanged. They then took this writ, the assignments of error being those heretofore noted.

*John G. Freeze, Brockway & Elwell, S. P. Wolverton* and *John W. Ryon*, for plaintiffs in error.—Hester was actually discharged on May 11th 1869. The court then adjudicated the whole question, and passed judgment upon his lawful detention, and that judgment was that he should be discharged. The district-attorney asked leave to enter a *nol. pros.* Leave was granted, and the indictment against Hester was thereby withdrawn. He stood as a prisoner who had been held two terms, and the indictment was abandoned.

If the mere fact that the record of a court shows that a *nolle prosequi* was entered by the district-attorney after two terms of imprisonment, is sufficient to deprive a prisoner of his right to plead a discharge under the Act of 1860, the statute becomes a nullity.

[Hester *v.* Commonwealth.]

If a discharge under this act is not a finality—a bar to further prosecution—it is a nullity. If, following a discharge, a prisoner can° be re-arrested and imprisoned for the same offence, perpetual imprisonment could follow without trial. Certainly the legislature could never have intended this. It is not contended that the mere entering of a *nolle prosequi* of itself bars a further prosecution for the same offence, but that this, followed by the judgment of the court that the prisoner be discharged on the last day of the term or session of the court, is equivalent to an acquittal. The judgment of discharge had nothing to do with the entering of a *nolle prosequi* by the district-attorney. The record shows that the district-attorney applied to court for leave, which was granted, and that in pursuance of this the *nolle prosequi* was entered. The judgment of discharge was on a subsequent motion, entirely unconnected with the entry of the *nolle prosequi*, and could have been moved for regardless of the action of the district-attorney.

Is a pardon admissible in evidence to make a witness competent which was obtained without a hearing at any regular meeting of the Board of Pardons, and which does not recite the same sentence as that contained in the record of conviction?

At the time of this trial a strong prejudice existed in this community against the "Ancient Order of Hibernians." The trials in Schuylkill county had just been concluded and it was impossible to obtain an unprejudiced jury. All that seemed necessary was to find that a prisoner was a "Mollie Maguire" and conviction followed. Hence the effort to connect the names of these prisoners with the order. This case was entirely different from the so-called "Mollie Maguire" cases in Schuylkill county. There a connection was proposed to be shown and actually was shown between certain divisions of the order and the crimes committed. Here there was no testimony showing any connection of the society whatever with the crime. On the contrary the whole evidence showed that the motive for the murder was to obtain money. The meeting to plan its execution, or rather the robbery, was accidental. It was not-pretended that there was a meeting of the society anywhere in relation to this crime, and the evidence in regard to the order, therefore, was only an appeal to the prejudices of the jury against it. Clearly such evidence was not admissible: Am. Crim. Law 640 ; Chit. Crim. Law 564 ; State *v.* Wisdom, 8 Porter 511 ; Baker *v.* State, 4 Ark. 56 ; State *v.* Arnold, 13 Ired. (N. C.) 191 ; Dunn *v.* State, 2 Ark. 229 ; Kinchelow *v.* State, 5 Humph. 9. Until some connection had been shown between the society and the commission of the crime it certainly could not be relevant, even to show that Donohue's saloon was a place for holding of the regular meetings of the society, much less a saloon where members of such society met accidentally.

The second avowed purpose of the evidence was still more unreasonable. The corroboration of an accomplice by his own testimony.

[Hester v. Commonwealth.]

The law requires that an accomplice be corroborated by other reliable testimony. Under any circumstances the testimony of an accomplice is looked upon by the law with great suspicion, and considered of no weight unless corroborated by others: The People v. Whipple, 9 Cowen 708; 1 Phillips's Ev. 111; King v. Farler, 8 C. & P. 106.

The defendants should have been allowed every privilege of impeaching Kelly's testimony and showing him unworthy of belief. The law judges human motives by human actions. An accomplice in a high felony is unworthy of credit, and he gains no title to credit by evidence which simply tends to show his own guilt. The law looks upon him as a witness testifying under the influence of some hidden or secret motive, and any evidence that tends to discover or explain his motives has never been held to be collateral or immaterial. The weight of the testimony of such a witness with the jury may depend entirely upon their supposition that his only motive is to tell the truth. Motives can only be inferred from conduct: Gaines v. Commonwealth, 14 Wright 327; Day v. Stickney et al., 14 Allen 257; Cameron v. Montgomery, 13 S. & R. 132; Ott et al. v. Houghton, 6 Casey 453; Batdorff v. Farmers' National Bank of Reading, 11 P. F. Smith 183; Chapman v. Coffin, 14 Gray 454; Tyler v. Pomeroy, 8 Allen 480; Starks v. People, 5 Denio 108; Newton v. Harris, 6 N. Y. 346.

The surrender of a prisoner charged with crime has always been considered in favor of the prisoner's innocence, and what Hester did and said when he first learned that suspicion rested on him on account of his supposed flight, was certainly evidence to rebut the argument of the Commonwealth that he had fled on account of this murder. It is an established rule of evidence that all the surrounding facts of a transaction, the *res gestæ*, may be submitted to a jury, and in general, the *res gestæ* mean the declarations and the surrounding facts and circumstances which grow out of the main transaction and have relation to it: U. S. v. Craig, 4 Wash. C. C. Rep. 729; State v. Swink, 2 Dev. & Bat. 9; State v. Stone, Rice 147; Kirby v. State, 7 Yerg. 259; 1 Greenlf. Ev., sect. 197; Oden v. Stublefield, 4 Ala. 40; Fountaine v. Beers, 19 Ala. 722; McClenkan v. McMillan, 6 Barr 367; Potts v. Everhart, 2 Casey 498; Tompkins v. Saltmarsh, 14 S. & R. 275; Wills on Circumstantial Evidence, p. 64, sect. 48.

The Commonwealth cannot call a witness to testify to a conversation, and then call another witness to testify that the first witness told substantially the same to him eight years before.

*John M. Clark*, District-Attorney, *C. R. Buckalew, F. W. Hughes* and *F. B. Gowen*, for the Commonwealth.—Hester did not object to the entry of the *nolle prosequi*, as he ought to have done if its entry was unreasonable or injurious to him. He does not

[Hester *v.* Commonwealth.]

seem to have demanded a trial, and he certainly did not claim or secure a discharge under the two-term regulation of the Penal Code and the statute of 1785.    We are to take the record as we find it, and to assume that what was done in court and by the court was rightly done.    It is certain that an untried defendant is not entitled to an absolute discharge at the end of a second term, under all circumstances : Commonwealth *v.* Sheriff of Allegheny, 16 S. & R. 304 ; Clark *v.* Commonwealth, 5 Casey 129.    Application for discharge under the two-term rule must be made to the proper court, at the proper time, and then the application will be denied unless proper grounds for its allowance are made to appear : Commonwealth *v.* Brown, 2 W. N. C. 153.

There is no provision of law requiring the whole sentence of a criminal to be recited in a pardon.    The evidence admitted under the offer relating to the Mollie Maguire organization was carefully limited by the court as to time, and excluded proof of specific acts of other members of the society than the defendants either before or after 1869.    The admission of this evidence is justified by recent decisions : Carroll *et al. v.* Commonwealth, 3 Norris 107 : Campbell *v.* Commonwealth, Id. 187.

The rejection of the evidence offered to contradict a witness on collateral matter, under the sixth and ninth assignments, was proper : Hildeburn *v.* Curran, 15 P. F. Smith 63 ; Whart. on Ev., sects. 541, 547, 559 ; Greenl. on Ev., sect. 449.

All testimony relevant to the circumstances of Hester's flight and of his arrest, including his own contemporaneous declarations, were in proof ; what was rejected were his alleged declarations about his return and surrender at times weeks after his flight and before the time of his arrest.    Clearly he could not make evidence for himself by statements in Illinois, in the absence of any person representing the Commonwealth, and independent of any fact or transaction put in evidence by the Commonwealth.    The authorities cited by the counsel for plaintiffs in error, upon the law of *res gestæ*, are therefore inapplicable.

In support of the propriety of the refusal to strike out Ikeler's testimony, the following authorities were cited : Deshon *et al. v.* Merchants' Insurance Co., 11 Metc. 199 ; Henderson *v.* Jones, 10 S. & R. 322 ; Commonwealth *v.* Wilson, 1 Gray 337 ; Commonwealth *v.* Jenkins, 10 Id. 489 ; Cooke *v.* Curtis, 6 Har. & Johns., (Md.) 93 ; Connecticut *v.* DeWolf, 8 Conn. 93 ; Whart. on Ev. 570.

[The important questions involved in this case, and the ability and care with which they were presented to the court by the distinguished counsel engaged, are the apology for the length of this report.    The paper book of the plaintiffs in error alone covered over eight hundred and fifty printed pages, and a more condensed report would have marred the symmetry of the case.—REP.]

[Hester *v.* Commonwealth.]

Mr. Justice WOODWARD delivered the opinion of the court, January 7th 1878.

At the argument here, no objection was made to the answers given to the points presented on the trial, or to the general charge of the court below. From a careful examination of the voluminous record that has been brought up, it is manifest that no effort was spared to secure an accurate and just result. The charge of the president of the Oyer and Terminer developed the whole cause in a perfectly satisfactory way. It was full, fair, temperate and unprejudiced; the material facts were stated in their due proportions; and the instructions upon legal questions were so intelligent and so clear as to make their apprehension and application by the jury free from the chance of mistake or doubt. In relation to the general features of the case, there is nothing, therefore, that requires remark. Only the particular errors alleged to have been committed in the progress of the trial are left for examination and review.

1. On the 11th of May 1869, Patrick Hester, on the motion of his counsel, was discharged from the prison of Columbia county, where he had been confined on a charge of complicity in the murder of Alexander W. Rea. The indictment against him had been found at the February term of the Court of Oyer and Terminer, and when he was discharged, the May term, the second after his arrest and imprisonment, had expired. It began on Monday, the 3d of May, and closed on Saturday, the 8th, for an order had been made on the 10th of February that it should be limited to a single week. Hester was discharged, therefore, three days after the day appointed for the expiration of the term. It was insisted on by his counsel that he was entitled, on the trial of this indictment, to the benefit of the provisions of the 57th section of the Act of the 31st of March 1860, declaring that if a prisoner "shall not be indicted or tried at the second term, session or court after his or her commitment, unless the delay happen on the application or with the consent of the defendant, or upon trial he shall be acquitted, he shall be discharged from imprisonment." Under this provision, the proceeding in May 1869 was set up as a bar to any subsequent prosecution. The section quoted was a re-enactment in substance of the third section of the Act of the 18th of February 1785, under which a doubt was expressed in Clark *v.* The Commonwealth, 5 Casey 136, whether the plea of a discharge under the two-term rule, prescribed by the statute, would be available against a second indictment. But the facts presented do not call for an inquiry into the effect upon the after liability to arrest and punishment of a prisoner in whose behalf the statutory provision may have been applied. Here, the record did not show a discharge under the two-term rule. It appears from the court minutes that immediately before the motion was made, the district-attorney had asked leave to enter a *nolle prosequi* as to Hester—that the motion was allowed—and that the entry was made

[Hester *v.* Commonwealth.]

at once. The motion for the discharge was not grounded on the rule. From anything that the record shows, it could not be said that such a motion, if made, would not have been denied. When the *nolle prosequi* was entered without conditions, the right of the prisoner to his freedom accrued. The motion for his discharge was the assertion of the right thus created. The other proceedings of the court, as disclosed by the minutes, show that Hester, Thomas Donohue, John Duffy and Michael Prior were under joint indictment. A jury was empannelled in Duffy's case, and after a trial, extending from the 3d to the 11th of May, a verdict of not guilty was rendered. A jury was then sworn as to Prior, and a formal verdict was taken on the 11th of May in his favor. The distinction made in disposing of the cases of the different prisoners proves that the district-attorney did not design to abandon all further prosecution of Hester. The effect of the entry of a *nolle prosequi* is fully settled as well in Pennsylvania as elsewhere. It was said by BLACK, C. J., in McFadden *v.* The Commonwealth, 11 Harris 12, that a prisoner charged with crime is not in jeopardy until the jury is empannelled and sworn. At common law, a *nolle prosequi* may at any time be retracted, and it not only is no bar to a subsequent prosecution on another indictment, but may be so far cancelled as to permit a revival of proceedings on the original bill: Commonwealth *v.* Wheeler, 2 Mass. 172; Commonwealth *v.* Miller, 2 Ash. 61. It will not have the effect of a *retraxit* even where a personal agreement has been made by the attorney-general that it should be a bar: State *v.* Lopez, 19 Mo. 254. The cases collected in the notes to sects. 513, 514 and 515, of Wharton's Criminal Law, fully support this doctrine. The record of the proceedings of the Columbia Oyer and Terminer, in May 1869, was conclusive as to the ground of the discharge, and ample authority justified the decision that the entry of the *nolle prosequi* was not a bar to this indictment.

2. Daniel Kelly, a confessed accomplice in the murder of Rea, was offered as a witness to fasten participation in the crime upon the prisoners. Objection was made to his testimony on the ground that he had been convicted of larceny in the Quarter Sessions of Schuylkill, and sentenced, on the 10th of September 1874, to separate and solitary confinement at labor for three years, and as this cause was tried in February 1877, within the period of the sentence prescribed, it was urged that he was incompetent. The objection was met by the production of a pardon granted by the governor on the 6th of January 1877. Against this it was alleged that the rules of the Board of Pardons had not been observed, and that the full sentence of the Court of Quarter Sessions was not recited. The pardon was the act of the chief executive officer of the Commonwealth. It recited a recommendation, in writing, by the lieutenant-governor, the secretary of the Commonwealth, and the attorney-general. It set out the offence for which Kelly was tried and con-

victed, the date of the conviction and sentence, the amount of the fine, the direction to pay the costs of prosecution, and the term of the imprisonment. All that was omitted was the direction for the restoration of the property stolen or the payment of its value. Upon irregularities and omissions of form such as these, it was proposed that the judges of the Oyer and Terminer should set aside and annul the deliberate action of the governor taken in the execution of a constitutional power expressly conferred. There was no allegation that the pardon was obtained by fraud or false pretence. If there had been, it is possible that the principles announced by Chief Justice Lowrie, in Commonwealth v. Halloway, 8 Wright 210, might have required its investigation. With the evidence presented to them, the court were simply bound to accept the executive action as controlling and conclusive.

3. Kelly's testimony was objected to for another reason. He had been convicted of highway robbery in Schuylkill county, and sentenced, on the 8th of September 1869, to imprisonment for two years. On the 7th of July 1871, he was discharged from custody, under the provisions of the Act of the 1st of May 1861. It was insisted that he was not competent to testify, because he had not complied with the terms of his sentence. Upon the production of the record of the conviction, it appeared that the trial had been in the Court of Quarter Sessions, and not in the Oyer and Terminer, of Schuylkill county. It was held that the proceedings resulting in the conviction and sentence were *coram non judice*, and the objection to the competency of the witness was overruled. There was no doubt in the proof of the facts on which the decision of the court was rested. While the indictment appeared to have been found in the Court of Oyer and Terminer, Quarter Sessions of the Peace and General Jail Delivery, at September sessions 1869, the record produced was entitled as in the Quarter Sessions alone. It was certified by the clerk, and authenticated by the seal of that court. Indeed, the parol testimony showed that no other seal for the use of the constitutional criminal courts of the county was in existence. There was presented the naked case of the record of a conviction in the Quarter Sessions for a crime triable only in the Oyer and Terminer. The whole proceeding was a nullity, and was properly disregarded. Dougherty v. The Commonwealth, 19 P. F. Smith 286, was a trial for homicide, where the prisoner had been arraigned, tried, convicted and sentenced in the Quarter Sessions. It was held by this court that the conviction and sentence were void for want of jurisdiction.

4. When the offer was made to prove the existence of the Ancient Order of Hibernians, and its objects and operation, the court expressed the opinion that it was " on the very outer verge of any evidence" that had been given in the trials in which the character of the organization had been involved. It was admitted, however, so

far as it related to facts existing in October 1868, but specific acts of others than those charged with complicity in the murder of Rea, committed either before or after that time, were excluded. Was this testimony irrelevant? It was not designed to be used to establish the commission of any independent crime. Nor was its object to affect general character, or to repel inferences from adversary facts. Its purpose was to explain the relations existing between the conspiritors, the reason, motive and opportunity for their combined action, and the nature of the tie that bound them together. The reason for the exclusion of evidence of collateral facts is, that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice, and mislead them: 1 Greenleaf's Evidence, sect. 52. Here the offer was not to show what could accurately be called collateral facts. The testimony could affect nobody but the parties charged with this murder, and could illustrate or tend to the proof of no other crime. Ten men, including the three prisoners, met in Donohue's saloon on the evening of the 16th of October 1868, and openly arranged the details of their plan to attack and rob Rea on the following day. Hester was the body-master of the Locust Gap division, and the nine others were members of the order. It was proposed to prove that, under its practical workings, the organization had come to be the means of procuring crimes of every grade to be perpetrated with comparative impunity; that protection of the perpetrators from arrest and punishment was afforded by secreting them, aiding their escape, and employing counsel and procuring false testimony for their defence; that from the members of each division individuals were selected by the body-master to commit any offence he might require at their hands; and that the members were bound to comply with his requirements. In effect, it was proposed to prove that those ten men, as members of the Ancient Order of Hibernians, and under the relations they held to each other as individual Mollie Maguires, organized themselves as a gang of bandits to carry into effect, on the 17th of October, the plot deliberated and decided upon the night before for the assault and robbery which ended in the murder. Without regard to the merits of other cases in which this class of evidence has been received, it was clearly competent, to the extent to which it was admitted, under the circumstances presented here. The facts were relevant, direct and essential. Without them the conduct of the prisoners and their associates would be explicable on no recognised or rational theory regarding the motives and modes of human action. With them, a jury were enabled to understand how the brutal and cold-blooded consultation in Donohue's saloon could have been had without concealment or reserve, and how a horrible murder could have been committed the next morning on a public highway in the open day.

5. For the same reasons that justified the admission of the

[Hester *v.* Commonwealth.]

general testimony, the question to Kelly complained of in the fifth assignment of error was warranted. It was certainly relevant to prove that the place where the men met was a common resort of members of the order. It afforded them means of communication and intercourse, and tended to explain the circumstances of the gathering at which the plan for the attack on Rea was arranged. Under this assignment, the question of the extent of the credit to which the testimony of Kelly as an accomplice was entitled, was discussed. The question was not properly raised. If it had been it would be necessary only to say that it was disposed of with entire accuracy in the answers to the points and in the general charge.

6. If, from the testimony of John Cannon in contradiction of Kelly, which the prisoners offered, any motives operating on Daniel Kelly's mind, when his alleged declarations were made, that had relation to this cause or these prisoners, could have been inferred, its admission would have been required by the principle decided in Gaines *v.* The Commonwealth, 14 Wright 327. But the offer was not connected with the prisoners or either of them. The testimony could have had no effect except upon the general credibility of Kelly as a witness. Unconnected with the cause and with the parties as his answers on cross-examination had been, they were given in reference to collateral matter, and were not subject to contradiction. " If a question is put to a witness which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who put the question, but it is conclusive against him:" 1 Greenleaf's Ev., sect. 449. So much of the offer as proposed to prove Kelly's declarations as connected with the murder was inadmissible, for as to those declarations, he had not been cross-examined.

7. On behalf of Hester, all the evidence of his conduct and declarations that could be at all legitimate, was permitted to be given. Declarations which form part of the *res gestæ* may be proved : Kirby *v.* The State, 7 Yerger 259. And declarations of one party made in the presence and hearing of the other, are *res gestæ :* McClenkan *v.* McMillan, 6 Barr 367. Evidence was permitted of what Hester said and did in November 1868, when he went west. The fact that he apprehended arrest on a charge of adultery and a charge of violating the laws of the United States against illicit distillation, was allowed to be shown. And his words and acts at the time of his arrest, including his statement that he had come to give himself up, were testified to by Lewis S. Parr and Jacob L. Girton. Statements made by himself to outside parties in Illinois and at his home in Locust Gap, could not be made evidence on any principle as *res gestæ.*

8. When E. R. Ikeler's testimony was offered it was admitted without exception. Lewis S. Parr had sworn to a conversation between Donohue and Hester in 1869. Evidence was given subsequently on behalf of the prisoners to discredit Parr's statement.

[Hester *v.* Commonwealth.]

Mr. Ikeler, who was district-attorney in 1869, was called to testify that Parr had made the same statement to him before Hester's discharge on the first indictment. The eighth error has been assigned for the refusal of a motion to strike out Ikeler's testimony. It was ruled in Henderson *v.* Jones, 10 S. & R. 322, that where a witness is contradicted and evidence is given to impeach his character, evidence may be given of what he swore on a former trial of the cause in order to corroborate his testimony. "A witness cannot be allowed, for the purpose of strengthening his testimony on his examination in chief, to state that he had previously communicated to others the same facts, but if it should become a material fact that the witness declared his knowledge to other persons, such persons may be called to prove it:" Daniel Dushore *v.* The Merchants' Insurance Co., 11 Metc. 199. The same rule was laid down in Commonwealth *v.* Wilson, 1 Gray 337, and in Commonwealth *v.* Jenkins, 10 Gray 489. In the charge the jury were instructed that "the testimony of Mr. Ikeler, the district-attorney, is evidence only for the purpose of showing that Parr's statement is not a fabrication of recent date, and not that the statement of Parr is true. That is for the jury to determine." The refusal to strike out the evidence was justified by authority and proper instructions were given for its application.

9. John Traverse was called to prove that Kelly had robbed him. Kelly had denied that he had done so in his cross-examination. The testimony was objected to as irrelevant and immaterial. It had no connection with any question in this cause. For reasons stated in passing on the seventh assignment of error, the ruling of the court was right.

The judgment is affirmed and it is ordered that the record be remitted that the sentence of the Court of Oyer and Terminer may be carried into execution.