617 A.2d 1339

COMMONWEALTH of Pennsylvania

v.

**Walter PESTINIKAS, Appellant.**

COMMONWEALTH of Pennsylvania

v.

**Helen PESTINIKAS, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1991.

Decided Dec. 10, 1992.

Harold Kane, Philadelphia, for appellants.

Michael J. Barrasse, Dist. Atty., Scranton, for Com., appellee.

Mary B. Seiverling, Deputy Atty. Gen., Harrisburg, amicus curiae.

Before WIEAND, McEWEN, OLSZEWSKI, DEL SOLE, BECK, TAMILIA, POPOVICH, JOHNSON and HUDOCK, JJ.

WIEAND, Judge:

The principal issue in this appeal is whether a person can be prosecuted criminally for murder when his or her failure to

perform a contract to provide food and medical care for another has caused the death of such other person. The trial court answered this question in the affirmative and instructed the jury accordingly. The jury thereafter found Walter and Helen Pestinikas guilty of murder of the third degree in connection with the starvation and dehydration death of ninety-two (92) year old Joseph Kly.[1] On direct appeal from the judgment of sentence,[2] the defendants contend that the trial court misapplied the law and gave the jury incorrect instructions. They argue, therefore, that they are entitled to an arrest of judgment because of the insufficiency of the evidence against them or at least a new trial because of the trial court's erroneous instructions to the jury.

The trial of this case began on November 24, 1986 and was concluded by the return of the jury's verdict on February 12, 1987. Only a portion of the evidence presented during this lengthy trial has been transcribed and certified to this Court for review. It is the responsibility of appellants "to provide a complete and comprehensive record to the reviewing court for the purposes of appeal." *Commonwealth v. Williams,* 357 Pa.Super. 462, 466, 516 A.2d 352, 354 (1986). See: Pa.R.A.P. 1911(a) and (d). Appellants' duty was "to order the transcript required and ascertain its presence in the record prior to certification for appeal." *Commonwealth v. Osellanie,* 408 Pa.Super. 472, 475, 597 A.2d 130, 131 (1991). A reviewing court "may only consider facts which have been duly certified in the record on appeal." *Commonwealth v. Buehl,* 403 Pa.Super. 143, 148, 588 A.2d 522, 524 (1991). See also: *Commonwealth v. Lowry,* 385 Pa.Super. 236, 246, 560 A.2d 781, 785–786 (1989). Although appellants' failure to provide us with a complete transcript has impaired our ability to conduct meaningful review of several additional issues raised by appel-

---

1. The jury acquitted both defendants of criminal conspiracy, and Walter Pestinikas was also acquitted of intimidating witnesses.

2. Each appellant was sentenced to serve a term of imprisonment for not less than five (5) years nor more than ten (10) years. Separate convictions for recklessly endangering another person were deemed to merge for sentencing purposes in the convictions for murder of the third degree.

lants, the record now before us does not prevent a determination of the principal issues which appellants have raised.

Joseph Kly met Walter and Helen Pestinikas in the latter part of 1981 when Kly consulted them about pre-arranging his funeral. In March, 1982, Kly, who had been living with a stepson, was hospitalized and diagnosed as suffering from Zenker's diverticulum, a weakness in the walls of the esophagus, which caused him to have trouble swallowing food. In the hospital, Kly was given food which he was able to swallow and, as a result, regained some of the weight which he had lost. When he was about to be discharged, he expressed a desire not to return to his stepson's home and sent word to appellants that he wanted to speak with them. As a consequence, arrangements were made for appellants to care for Kly in their home on Main Street in Scranton, Lackawanna County.

Kly was discharged from the hospital on April 12, 1982. When appellants came for him on that day they were instructed by medical personnel regarding the care which was required for Kly and were given a prescription to have filled for him. Arrangements were also made for a visiting nurse to come to appellants' home to administer vitamin B–12 supplements to Kly. Appellants agreed orally to follow the medical instructions and to supply Kly with food, shelter, care and the medicine which he required.

According to the evidence, the prescription was never filled, and the visiting nurse was told by appellants that Kly did not want the vitamin supplement shots and that her services, therefore, were not required. Instead of giving Kly a room in their home, appellants removed him to a rural part of Lackawanna County, where they placed him in the enclosed porch of a building, which they owned, known as the Stage Coach Inn. This porch was approximately nine feet by thirty feet, with no insulation, no refrigeration, no bathroom, no sink and no telephone. The walls contained cracks which exposed the room to outside weather conditions. Kly's predicament was compounded by appellants' affirmative efforts to conceal his whereabouts. Thus, they gave misleading information in re-

sponse to inquiries, telling members of Kly's family that they did not know where he had gone and others that he was living in their home.

After Kly was discharged from the hospital, appellants took Kly to the bank and had their names added to his savings account. Later, Kly's money was transferred into an account in the names of Kly or Helen Pestinikas, pursuant to which moneys could be withdrawn without Kly's signature. Bank records reveal that from May, 1982, to July, 1983, appellants withdrew amounts roughly consistent with the three hundred ($300) dollars per month which Kly had agreed to pay for his care. Beginning in August, 1983 and continuing until Kly's death in November, 1984, however, appellants withdrew much larger sums so that when Kly died, a balance of only fifty-five ($55) dollars remained. In the interim, appellants had withdrawn in excess of thirty thousand ($30,000) dollars.

On the afternoon of November 15, 1984, when police and an ambulance crew arrived in response to a call by appellants, Kly's dead body appeared emaciated, with his ribs and sternum greatly pronounced. Mrs. Pestinikas told police that she and her husband had taken care of Kly for three hundred ($300) dollars per month and that she had given him cookies and orange juice at 11:30 a.m. on the morning of his death. A subsequent autopsy, however, revealed that Kly had been dead at that time and may have been dead for as many as thirty-nine (39) hours before his body was found. The cause of death was determined to be starvation and dehydration. Expert testimony opined that Kly would have experienced pain and suffering over a long period of time before he died.

At trial, the Commonwealth contended that after contracting orally to provide food, shelter, care and necessary medicine for Kly, appellants engaged in a course of conduct calculated to deprive Kly of those things necessary to maintain life and thereby cause his death. The trial court instructed the jury that appellants could not be found guilty of a malicious killing for failing to provide food, shelter and necessary medicines to Kly unless a duty to do so had been imposed upon

them by contract. The court instructed the jury, inter alia, as follows:

> In order for you to convict the defendants on any of the homicide charges or the criminal conspiracy or recklessly endangering charges, you must first find beyond a reasonable doubt that the defendants had a legal duty of care to Joseph Kly.
>
> There are but two situations in which Pennsylvania law imposes criminal liability for the failure to perform an act. One of these is where the express language of the law defining the offense provides for criminal [liability] based upon such a failure. The other is where the law otherwise imposes a duty to act.
>
> Unless you find beyond a reasonable doubt that an oral contract imposed a duty to act upon Walter and Helen Pestinikas, you must acquit the defendants.

Appellants contend that this was error.

The applicable law appears at 18 Pa.C.S. § 301(a) and (b) as follows:

> **(a) General rule.**—A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act of which he is physically capable.
>
> **(b) Omission as basis of liability.**—Liability for the commission of an offense may not be based on an omission unaccompanied by action unless:
>
>> (1) the omission is expressly made sufficient by the law defining the offense; or
>>
>> (2) a duty to perform the omitted act is otherwise imposed by law.

With respect to subsection (b), Toll, in his invaluable work on the Pennsylvania Crimes Code, has commented

> ... [Subsection (b) ] states the conventional position with respect to omissions unaccompanied by action as a basis of liability. Unless the omission is expressly made sufficient by the law defining the offense, a duty to perform the omitted act must have been otherwise imposed by law for

the omission to have the same standing as a voluntary act for purposes of liability. *It should, of course, suffice, as the courts now hold, that the duty arises under some branch of the civil law. If it does, this minimal requirement is satisfied, though whether the omission constitutes an offense depends as well on many other factors.*

Toll, Pennsylvania Crimes Code Annotated, § 301, at p. 60, quoting Comment, Model Penal Code § 2.01 (emphasis added).

In *State v. Brown*, 129 Ariz. 347, 631 P.2d 129 (1981), the Court of Appeals for Arizona affirmed a manslaughter conviction of the operator of a boarding home in connection with the starvation death of a ninety-eight year old resident. The Arizona Court interpreted a statutory provision which is similar to Section 301 of the Pennsylvania Crimes Code in the following manner:

As stated in A.R.S. Sec. 13–201 and demonstrated by the case law, the failure to perform a duty imposed by law may create criminal liability. In the case of negligent homicide or manslaughter, the duty must be found outside the definition of the crime itself, perhaps in another statute, or in the common law, or in a contract. The most commonly cited statement of the rule is found in *People v. Beardsley*, 150 Mich. 206, 113 N.W. 1128 (1907):

"The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with manslaughter.... This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law or by contract, and the omission to perform the duty must be the immediate and direct cause of death. (citations omitted)" 113 N.W. at 1129.

In *Jones v. United States*, 308 F.2d 307 (C.A.D.C.1962), the court stated:

"There are at least four situations in which the failure to act may constitute breach of a legal duty. One can be

held criminally liable: first, where a statute imposes a duty to care for another; second, where one stands in a certain status relationship to another; third, where one has assumed a contractual duty to care for another; and fourth, where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid." 308 F.2d at 310.

*State v. Brown, supra,* 129 Ariz. at 349–350, 631 P.2d at 131–132 (footnote omitted).

A similar rationale was employed by the Supreme Court of Virginia in *Davis v. Commonwealth,* 230 Va. 201, 335 S.E.2d 375 (1985), which upheld the conviction of a woman for involuntary manslaughter in the death by starvation and exposure of her elderly mother. The *Davis* Court held that the evidence had established the breach of an implied contract to care for her mother, in return for which the defendant had been permitted to live in her mother's home and share her mother's social security benefits. The legal principles upon which this holding was based were explained by the Supreme Court of Virginia as follows:

A legal duty is one either "imposed by law, or by contract." *Pierce v. Commonwealth,* 135 Va. 635, 651, 115 S.E. 686, 691 (1923). When a death results from an omission to perform a legal duty, the person obligated to perform the duty may be guilty of culpable homicide. *Biddle v. Commonwealth,* 206 Va. 14, 20, 141 S.E.2d 710, 714 (1965); *Pierce,* 135 Va. at 651, 115 S.E. at 691. If the death results from a malicious omission of the performance of a duty, the offense is murder. On the other hand, although no malice is shown, if a person is criminally negligent in omitting to perform a duty, he is guilty of involuntary manslaughter. *Biddle,* 206 Va. at 20, 141 S.E.2d at 714.

*Davis v. Commonwealth, supra* 230 Va. at 205, 335 S.E.2d at 378.

"The omission or neglect to perform a legal duty resulting in death may constitute murder where the omission was willful and there was deliberate intent to cause death. So also, willfully allowing one to be exposed to conditions which will

probably result in death, where there is a duty to protect such person, constitutes murder." 40 C.J.S., Homicide, § 41, at p. 402 (citations omitted).

As a general rule, where one person owes to another either a legal or a contractual duty, an omission to perform that duty resulting in the death of persons to whom the duty was owing renders the person charged with the performance of such duty guilty of a culpable homicide. If several enter into a joint undertaking imposing upon all alike a personal duty in respect of its performance, the death of a third party by reason of the neglect or omission of such duty renders them all jointly liable. The duty imposed, however, must be a plain duty. It must be one on which different minds must agree, or generally agree, and which does not admit of any discussion as to its obligatory force. Where doubt exists as to what conduct should be pursued in a particular case, and intelligent men differ as to the proper action to be taken, the law does not impute guilt to anyone, where, from the omission to adopt one course instead of another, fatal consequences follow to others. The law does not enter into the reasons governing the conduct of men in such cases to determine whether they are culpable. Again, the duty must be one which the party is bound to perform by law or by contract, and not one the performance of which depends simply upon his humanity, or his sense of justice or propriety. It has been said that a legal duty to assist another does not arise out of a mere moral duty. Furthermore, where a legal duty is shown to have existed, it must also appear as a condition to culpability that the death was the direct and immediate consequence of the omission.

40 Am.Jur.2d, Homicide, § 88, at p. 381 (citations omitted). See also: 2 Wharton's Criminal Law, § 172 (14th ed. 1979); LaFave and Scott, Criminal Law, § 26 (1972); *Jones v. United States,* 308 F.2d 307, 310 (D.C.Cir.1962); *Flippo v. State,* 258 Ark. 233, 236–237, 523 S.W.2d 390, 393 (1975); *State v. Clark,* 5 Conn.Cir. 699, 707–709, 261 A.2d 294, 299–300 (1969); *People v. Montecino,* 66 Cal.App.2d 85, 100–101, 152 P.2d 5, 13

(1944); *People v. Beardsley*, 150 Mich. 206, 208–209, 113 N.W. 1128, 1129 (1907).

 Consistently with this legal thinking we hold that when, in 18 Pa.C.S. § 301(b)(2), the statute provides that an omission to do an act can be the basis for criminal liability if a duty to perform the omitted act has been imposed by law, the legislature intended to distinguish between a legal duty to act and merely a moral duty to act. A duty to act imposed by contract is legally enforceable and, therefore, creates a legal duty. It follows that a failure to perform a duty imposed by contract may be the basis for a charge of criminal homicide if such failure causes the death of another person and all other elements of the offense are present. Because there was evidence in the instant case that Kly's death had been caused by appellants' failure to provide the food and medical care which they had agreed by oral contract to provide for him, their omission to act was sufficient to support a conviction for criminal homicide, and the trial court was correct when it instructed the jury accordingly.

 Our holding is not that every breach of contract can become the basis for a finding of homicide resulting from an omission to act. A criminal act involves both a physical and mental aspect. An omission to act can satisfy the physical aspect of criminal conduct only if there is a duty to act imposed by law. A failure to provide food and medicine, in this case, could not have been made the basis for prosecuting a stranger who learned of Kly's condition and failed to act. Even where there is a duty imposed by contract, moreover, the omission to act will not support a prosecution for homicide in the absence of the necessary mens rea. For murder, there must be malice. Without a malicious intent, an omission to perform duties having their foundation in contract cannot support a conviction for murder. In the instant case, therefore, the jury was required to find that appellants, by virtue of contract, had undertaken responsibility for providing necessary care for Kly to the exclusion of the members of Kly's family. This would impose upon them a legal duty to act to preserve Kly's life. If they maliciously set upon a course of

withholding food and medicine and thereby caused Kly's death, appellants could be found guilty of murder.

Appellants' reliance upon *Commonwealth v. Konz*, 498 Pa. 639, 450 A.2d 638 (1982), is misplaced. In that case, the Court did not consider criminal responsibility for an omission to perform a duty imposed by contract, but considered only the nature of the duties arising from the marital relationship. The Court held that where a husband was aware of his condition, i.e., diabetes, and competently made a voluntary decision to forego further treatment, i.e., insulin, his wife was not criminally liable for failing to summon medical help. Because *Konz* was carefully limited by the Court to its own facts, it provides little, if any, guidance in the instant case.

With respect to the alleged insufficiency of the evidence, it may also be observed that appellants' culpable conduct, according to the evidence, was not limited merely to an omission to act. It consisted, rather, of an affirmative course of conduct calculated to deprive Kly of the food and medical care which was otherwise available to him and which was essential to continued life. It included efforts to place Kly beyond the ability of others to provide such needs. Such a course of conduct, the jury could find, as it did, had been pursued by appellants willfully and maliciously, who thereby caused Kly's death.

Appellants argue that, in any event, the Commonwealth failed to prove an enforceable contract requiring them to provide Kly with food and medical attention. It is their position that their contract with Kly required them to provide only a place for Kly to live and a funeral upon his death. This obligation, they contend, was fulfilled. Although we have not been provided with a full and complete record of the trial, it seems readily apparent from the partial record before us, that the evidence was sufficient to create an issue of fact for the jury to resolve. The issue was submitted to the jury on careful instructions by the learned trial judge and does not

present a basis entitling appellants to post-trial relief.[3]

■ Appellants next contend that the trial court committed reversible error when it (1) allowed the jury to view a photograph depicting the decedent's nude body; and (2) overruled objections to evidence that appellants had attempted to have persons in high political office persuade the district attorney to drop charges against them. Our ability to conduct appellate review of these issues has been impaired by the absences of the photograph and the pertinent testimony from the record which has been certified to this Court.[4] In order to resolve these issues, therefore, we rely on factual descriptions contained in the opinion of the trial court. See: *Commonwealth v. Osellanie, supra,* 408 Pa.Super. at 476, 597 A.2d at 132.

■ The photograph about which appellants complain was in color and purported to show the decedent's nude body as it lay on the coroner's table in the same condition as when it was discovered by ambulance personnel and police on November 15, 1984. With respect to this photograph, the trial court observed as follows:

The photograph (Exhibit 54) depicts the victim's unclothed body lying on the coroner's table. It shows the condition of the victim's body at the time of death as it was found by ambulance personnel and police. The exhibit clearly is *not* the kind of photograph of a corpse that is inflammatory or gruesome per se. Defendants claim that the Commonwealth attempted to "shock the jury and try its case on emotional appeal."

At the inception of trial the trial judge reviewed certain photographs which the Commonwealth sought to introduce at trial. A total of twelve photographs, depicting various

**3.** We reject appellants' contention that Section 301 of the Crimes Code is unconstitutionally vague. This issue was not raised by appellants in their post-trial motions, and it has not been addressed by the trial court. Therefore, the issue of the constitutionality of 18 Pa.C.S. § 301 has not been preserved for appellate review. See: *Commonwealth v. Gravely,* 486 Pa. 194, 198–199, 404 A.2d 1296, 1298 (1979); *Commonwealth v. Copeland,* 381 Pa.Super. 382, 385, 554 A.2d 54, 55 (1988).

**4.** Efforts to obtain this evidence have been unsuccessful.

portions of the victim's body, were submitted for inspection. Of these twelve, the Court ruled that a total of only *three* photographs were admissible, including the photograph now at issue. The Commonwealth's photographic evidence underwent a painstaking and cautious screening process to eliminate photographs which could possibly inflame the minds and passions of the jurors.

Furthermore, under the second phase of the admissibility test, the photograph (Exhibit 54) was "of such evidentiary value that [its] need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Petrakovich*, [459 Pa. 511, 329 A.2d 844 (1974)].

The photograph of the victim was important to the Commonwealth to sustain its burden of proof. There were no eyewitnesses to the death of Joseph Kly. There were no admissions or confessions from the defendants. There was no "smoking gun." The photograph in question showed what happened to the decedent and, therefore, served as an aid to the jury in understanding the crime committed. Further, the introduction of this photograph served a number of specific and well-recognized evidentiary purposes. The photograph helped prove the corpus delicti; it showed the extent of the decedent's wasted torso, and the readily observable condition of the decedent; it assisted in portraying the cause of death by starvation and it corroborated the testimony of a variety of the Commonwealth's witnesses. The essential nature of this photographic evidence is further established by the fact that the exhibit helped to support the inference of the defendants' intent to kill.

In *Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547 (1982), the Court stated:

"A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of the inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential func-

tions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt."

The photograph (Exhibit 54) of the decedent was not pleasant to view. However, murder was alleged, and the photograph was offered in support of proof of requisite intent. The general propriety of such a procedure has been well established. "In assessing the intent of the actor in a case of criminal homicide, be it to inflict serious bodily injury or to kill, *the fact finder who deals in such an intangible inquiry must be aided to every extent possible.*" *Commonwealth v. McCutchen*, 499 Pa. 597, 602, 454 A.2d 547, 552 (1982), also see *Commonwealth v. Edwards*, 493 Pa. 281, 426 A.2d 550 (1981), *Commonwealth v. Smith*, 477 Pa. 505, 384 A.2d 1202 (1978). In this light, the photograph of the victim depicting his severely emaciated body was supportive and necessary evidence of intent to kill. Although medical testimony was presented at trial, the degree of starvation and the readily observable severity of emaciation could only be demonstrated to the jury by the use of the photograph in question. The availability of alternate evidence of a verbal nature does not obviate the admissibility of photographs. *Commonwealth v. McCutchen, supra.*

The admission of the photograph (Exhibit 54) was not error and was proper due to its essential evidentiary value when balanced against the likelihood of inflaming the jury. (footnote omitted and emphasis in original).

The Supreme Court has held that photographs of a homicide victim are not per se inflammatory, and the admission of such photographs is within the sound discretion of the trial court. See: *Commonwealth v. Edwards*, 521 Pa. 134, 151, 555 A.2d 818, 827 (1989); *Commonwealth v. Garcia*, 505 Pa. 304, 313, 479 A.2d 473, 478 (1984); *Commonwealth v. Hudson*, 489 Pa. 620, 630, 414 A.2d 1381, 1386 (1980). In making a determination regarding the admissibility of photographs of a homicide victim, a trial court must apply a two step analysis.

The trial judge must initially decide whether the photographs possess inflammatory characteristics. If they do not the photographs are admissible as are any evidentiary items, subject to the qualification of relevance. If the photographs are deemed inflammatory, then the trial judge must decide whether the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of their inflaming the passions of the jurors. *Commonwealth v. Hudson*, 489 Pa. 620, 630, 414 A.2d 1381, 1386 (1980).

*Commonwealth v. Strong*, 522 Pa. 445, 453, 563 A.2d 479, 483 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990). See also: *Commonwealth v. Miller*, 490 Pa. 457, 468–469, 417 A.2d 128, 134 (1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *Commonwealth v. Batty*, 482 Pa. 173, 177, 393 A.2d 435, 437 (1978).

In the instant case, it appears that the trial court deemed the photograph of the decedent sufficiently inflammable to require a cautionary jury instruction.[5] The court determined, nevertheless, that the photograph possessed such evidentiary value as to outweigh any possibility of arousing passion in the jurors. On the limited record which has been provided to us, we cannot find that this was an abuse of discretion.

It is well settled that when a person has committed a crime, and knows that he is wanted for it, any attempt by that person to flee or conceal his whereabouts, to escape from custody or resist arrest, to conceal or destroy evidence, to give false statements or testimony, to intimidate or attempt to influence witnesses, or to otherwise engage in conduct designed to avoid apprehension or prosecution for such crime may be admissible

**5.** During its charge to the jury, the court gave cautionary instructions as follows:

> Certain photographs of the body of Joseph Kly were admitted into evidence for whatever rational value they may have in proving or disproving the facts in this case. They are not pleasant photographs to look at. You should not let them stir up your emotions to the prejudice of the defendant. Your verdict must be based on a rational and fair consideration of all of the evidence and not on passion or prejudice against the defendant, the Commonwealth or anyone else connected with this case.

as evidence of consciousness of guilt, and may, along with other evidence in the case, form a basis from which guilt may be inferred. See: Packel and Poulin, Pennsylvania Evidence, Ch. IV, § 423 (1987); 29 Am.Jur.2d, Evidence, § 278. See, e.g.: *Commonwealth v. Lark*, 518 Pa. 290, 308–309, 543 A.2d 491, 500 (1988) (attempts to intimidate or influence witnesses); *Commonwealth v. Goldblum*, 498 Pa. 455, 473, 447 A.2d 234, 243 (1982) (attempting or planning to kill witness); *Commonwealth v. Coyle*, 415 Pa. 379, 393, 203 A.2d 782, 789 (1964) (flight or concealment); *Commonwealth v. Bolish*, 381 Pa. 500, 524, 113 A.2d 464, 476 (1955) (false or contradictory statements by accused); *Commonwealth v. Soli*, 273 Pa.Super. 158, 163, 417 A.2d 216, 219 (1979) (efforts to destroy or dispose of incriminating evidence). " '[E]vidence of the misconduct of a party in connection with the trial is admissible as tending to show that the party guilty of the misconduct is unwilling to rely on the truth of his cause, or is conscious that it is an unjust one.' " Packel and Poulin, *supra* § 423, at p. 277, quoting *McHugh v. McHugh*, 186 Pa. 197, 203, 40 A. 410, 412 (1898). In *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A.2d 743 (1953), the Supreme Court stated the rule as follows:

> Flight, manifestations of mental distress, fear at the time of or just before or just after discovery of the crime, an attempt to commit suicide at such time, as well as evidence to prove motive, intent, plan or design are admissible. Cf. *Commonwealth v. Giacobbe*, 341 Pa. 187, 19 A.2d 71; *Commonwealth v. Boschino*, 176 Pa. 103, 34 A. 964; *Commonwealth v. Del Giorno*, 303 Pa. 509, 154 A. 786, 788; *Hester v. Commonwealth*, 85 Pa. 139; *McManus v. Commonwealth*, 91 Pa. 57; *McMeen v. Commonwealth*, 114 Pa. 300, 306, 9 A. 878; *Commonwealth v. Minoff*, 363 Pa. 287, 69 A.2d 145, and other cases cited in *Commonwealth v. Truitt*, 369 Pa. 72, 81, 90, 85 A.2d 425; *Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301; *Commonwealth v. Guida*, 298 Pa. 370, 148 A. 501.

*Id.* at 159, 94 A.2d at 747. See also: *Commonwealth v. Giacobbe*, 341 Pa. 187, 193, 19 A.2d 71, 74 (1941) (defendant's attempt to commit suicide admissible to show consciousness of

guilt); *Commonwealth v. Sanchez*, 416 Pa.Super. 160, 171–173, 610 A.2d 1020, 1026–1028 (1992) (defendant's post-arrest threats to commit suicide admissible to show consciousness of guilt).

In reliance on this principle, the trial court allowed testimony that appellants had attempted to avoid prosecution by exerting political influence on the prosecuting attorney. This testimony was received to show consciousness of guilt and was described by the trial court in its post-trial opinion as follows:

> The jury heard testimony that defendants attempted to have certain politically connected persons intercede on their behalf. Ann Anstine, a member of the Pennsylvania Republican State Committee, testified that both defendants had come to visit her on more than one occasion after their arrest and pleaded with her to intercede on their behalf and try "to get Preate off the investigation." Lester Buerlein, chairman of the Wayne County Republican Party, testified that defendants met with him at his office in Honesdale. At this meeting the defendants asked him to intercede on their behalf and "try to get the investigation stopped."

Appellants contend that the allowance of this testimony was error. We disagree.

After careful consideration, we conclude and, therefore, hold that an attempt by a criminal defendant to obtain and apply political pressure for the purpose of obtaining a dismissal of charges is a relevant circumstance tending to show consciousness of guilt. It is a fact tending to show that the defendant " 'is unwilling to rely on the truth of his cause, or is conscious that it is an unjust one.' " Packel and Poulin, *supra*, quoting *McHugh v. McHugh, supra*. As such, it may be considered by a jury, together with other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt.[6]

6. The trial court, during its final charge, gave cautionary instructions to the jury as follows:

> You have heard evidence tending to show that the defendant may have been involved in improper conduct for which the defendant is not on trial. I am speaking of testimony to the effect that the defendant spoke to persons to have the investigation dropped. This

Appellants moved pre-trial to suppress statements which they made to police and evidence obtained by police during two warrantless searches of the room in which Kly's body was found. Their suppression motions were denied, and appellants now argue that this was error.

Where, as here, it is the defendants who have appealed, we consider only the evidence presented by the prosecution, and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record for the suppression court's findings, we are bound thereby and may reverse only if the legal conclusions drawn from those facts are in error. *Commonwealth v. Whitney*, 511 Pa. 232, 239–240, 512 A.2d 1152, 1156 (1986). See also: *Commonwealth v. O'Shea*, 523 Pa. 384, 395, 567 A.2d 1023, 1028 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990); *Commonwealth v. Agnew*, 411 Pa.Super. 63, 71, 600 A.2d 1265, 1269 (1991). An appellate court will "affirm the decision of the suppression court 'if it can be sustained for any reason whatsoever, even if the [suppression] court offered an erroneous reason to support its action.'" *Commonwealth v. Bowers*, 400 Pa.Super. 377, 381, 583 A.2d 1165, 1167 (1990), quoting *Commonwealth v. Reidenbaugh*, 282 Pa.Super. 300, 309–310, 422 A.2d 1126, 1131 (1980). See also: *Commonwealth v. O'Shea, supra; Commonwealth v. Bagley*, 408 Pa.Super. 188, 193, 596 A.2d 811, 813 (1991).

On the day on which Kly's body was discovered, Helen Pestinikas called a volunteer ambulance company to remove the body, and the police were routinely notified. When they arrived, they were not aware of the circumstances

evidence is before you for a limited purpose. That is, the purpose of tending to show consciousness of guilt. This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

If you find the defendant guilty, it must be because you are convinced by the evidence that the defendant committed the crimes charged and not because you believe the defendant is wicked or was involved in other improper conduct.

of Kly's death and did not suspect that it had been caused by criminal conduct. They arrived to render assistance and not to investigate a possible homicide. When the Pestinikases were asked questions, they exhibited no reluctance to provide answers and, in fact, volunteered information. Helen Pestinikas was asked if the police could return to the room to take photographs, and she readily consented, telling Lt. Joseph Naus that he could "do whatever he had to do." Several days later, both Walter and Helen Pestinikas signed written consents permitting police to search the room without a warrant. The suppression court found that these consents had been given voluntarily. Appellants had not in any way been placed in a coercive atmosphere during the days immediately following Kly's death, and the trial court's findings that their cooperation was voluntary are fully supported by competent evidence. Because the warrantless searches of the room were made with appellants' voluntary consent, the suppression court properly held that the fruits thereof were not subject to suppression. See: *Commonwealth v. Markman,* 320 Pa.Super. 304, 313–315, 467 A.2d 336, 341–342 (1983). See also: *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Bagley, supra,* 408 Pa.Super. at 201, 596 A.2d at 817.

Because we agree with the suppression court that the several searches of Kly's room were consensual, we find it unnecessary to review the court's conclusion that appellants lacked standing to object to the warrantless search of Kly's room. Whether or not they had "standing," it was eminently clear that they voluntarily had consented to have the police enter Kly's room and conduct a search.

 Finally, when appellants unexpectedly presented themselves at the district attorney's office on November 19, 1984, and insisted upon making a statement in order to "clear the air," they were not subjected to custodial interrogation, and their statement was not coerced. On this occasion, appellants were advised of their *Miranda*[7] rights and declined an

7. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

offer to have counsel present. Therefore, the suppression court could find, as it did, that appellants' statement had been given voluntarily and was not subject to being suppressed.

Having found no valid reason for disturbing the jury's verdicts, we conclude that the judgments of sentence must be, as they are,

AFFIRMED.

TAMILIA, J., files a concurring opinion, in which OLSZEWSKI, J., joins.

McEWEN, J., files a dissenting opinion in which DEL SOLE, J., joins.

DEL SOLE, J., files a dissenting opinion in which McEWEN, J., joins.

TAMILIA, Judge, concurring:

I join the majority Opinion by Wieand, J., but write separately because some elements of the majority Opinion are expressed differently than I perceive the issues to be and do not adequately express my views in this regard. I have no problem with the disposition of the technical rulings on the admissibility of evidence, the sufficiency of the evidence, avoidance of prosecution by exerting political influence and permission to search and to make a voluntary statement.

The dissent misconstrues the thrust of this case when it would find, contrary to the instruction of the trial court, the failure to perform a civil contract, through simple omission alone, is insufficient to meet the *voluntary act* requirements of Section 301 of the Crimes Code. The dissent errs in asserting that a contract may not create a legal duty which can lead to a homicide charge and conviction when the evidence establishes the breach of that duty was the direct cause of death, and secondly, in presuming that the evidence established a simple *omission* of the duty. It is clear that a contractual undertaking to feed, clothe and shelter an elderly dependent person establishes a legal duty to provide such reasonable care and that failure to do so, resulting in the death of the dependent

person, may be the basis for a homicide charge. All that remains to be determined is the degree of the crime based upon whether the omission was negligent or intentional. As to the degree of the homicide, where the evidence establishes malice by reason of the prolonged denial of food, liquids and adequate care and shelter, the seclusion, isolation and conceal-ment of the dependent person from professional caretakers, while withdrawing funds from the victim's bank account for the personal use of the caretaker, malice and implied intent were present and a jury properly could find beyond a reason-able doubt guilt of murder in the third degree.

The facts in this case are essential to the legal ruling as they establish the contractual undertaking, the obligation, the omissions and voluntary actions, the malicious concealment and the misappropriation of funds of the victim. They estab-lish the initial contact between the appellants and the dece-dent, Joseph Kly, who was approximately 90 years old, was made when he attempted to make pre-arrangements for his funeral. Six months later, the decedent was taken to Moses Taylor Hospital in the city of Scranton by members of his family, where he remained for approximately three weeks. When discharged from the hospital, he was alert of mind and was able to eat certain types of food and was gaining weight under the care of the hospital. Upon discharge, he informed hospital officials he did not wish to return to live with his stepson and instead asked them to contact the appellants. After conferring with the decedent and hospital personnel, appellants made arrangements to take Mr. Kly home with them.

On the day of discharge, April 12, 1982, the Pestinikas' appeared at the hospital and were given certain instructions by medical personnel. Hospital personnel testified appellants agreed to abide by these instructions and provide Mr. Kly with the food, care, shelter and medicine that he needed. In particular, Mr. Kly needed a soft diet, and while he was mobile when discharged from the hospital, he was able to walk only with the aide of a walker. A prescription was given for Mr. Kly's medication which, almost two years later, was found

never to have been filled. Proceeding directly from the hospital, the appellants and Mr. Kly went to the bank where he had his savings account and placed that account in joint names with the defendants, giving them access to his money. Social security and black lung benefits which were deposited directly into this account were transferred to the account of Joseph Kly or Helen Pestinikas, permitting them to withdraw money from the account without Mr. Kly's signature.

The evidence showed Mr. Kly was placed by the defendants in a hastily prepared, sparsely furnished closed-in porch in the building known as the Stage Coach Inn. Mr. Kly's room was approximately 9 feet by 20 feet, cracks were showing in the walls, exposing the premises to the air. The room had no insulation, no bathroom, no sink, no refrigeration and no food. The Pestinikas' led others to believe that Mr. Kly was staying at their home on North Main Avenue in the city of Scranton. Visiting Nurses Association personnel testified appellants prevented employees from this organization from seeing Mr. Kly. From May 1982 through July 1983 withdrawals from Mr. Kly's bank account averaged between $300 and $320 per month, an amount generally consistent with the appellants' agreement to take care of Mr. Kly for $300 per month. Beginning in August 1983, however, there was a systematic withdrawal of larger amounts of money from the joint account: $900 was withdrawn in August, $1,200 in October, $3,300 in November, and $3,500 in December. In 1984, sums in the amount of $1,500 in January, $1,000 in February, $2,700 in March, $2,100 in April, and $1,000 in May were withdrawn. In succeeding months during 1984 through November, when Mr. Kly died, thousands more dollars were withdrawn from the account so that a total of $35,000 had been withdrawn and when Mr. Kly expired, only $55 remained.

During the period Mr. Kly was in their care, the Pestinikas' refused to disclose his whereabouts to his family, to visiting nurses or to hospital personnel. Ambulance personnel who arrived at the Stage Coach Inn on November 15, 1984, described the scene as sub-human. Mr. Kly was found in a bed in a room covered with filth and human feces. His severely

emaciated body weighed less than 60 pounds. According to medical experts, Mr. Kly died not only of starvation but also dehydration from lack of water. Those experts testified it would have taken a considerable period of time for him to die in that condition and the process would have been extremely painful. The Commonwealth alleged that the starvation of Mr. Kly was deliberate on the part of the defendants in that they not only denied him of sustenance but prevented others from providing it.

Appellants were charged with first degree murder,[1] third degree murder,[2] voluntary manslaughter,[3] involuntary manslaughter,[4] criminal conspiracy to commit murder[5] and recklessly endangering another person.[6] Walter Pestinikis was also charged with two counts of intimidation of witnesses.

Following a jury trial lasting sixty (60) days, appellants were found guilty of murder in the third degree and recklessly endangering another person.

It should be considered first whether the court erred in instructing the jury that if the Commonwealth established beyond a reasonable doubt that the defendants owed Mr. Joseph Kly a legal duty of care by virtue of a contract clearly understood by defendants, who had the means, ability and opportunity to perform the duties of care, and the omission or failure to take care of Mr. Kly was the direct cause of his death, it could proceed to determine whether the Commonwealth proved each of the defendants guilty of any of the crimes.

Appellants contend and the dissent agrees the charge was in error because a civil contract cannot support a legal duty, the breach of which can result in criminal prosecution for homi-

1. 18 Pa.C.S. § 2052(a).
2. *Id.,* § 2502(c).
3. *Id.,* § 2503.
4. *Id.,* § 2504.
5. *Id.,* § 903.
6. *Id.,* § 2705.

cide. Section 301(b)(2) of the Crimes Code provides in relevant part:

> Liability for the commission of any offense may not be based on an omission unaccompanied by action unless ... a duty to perform the omitted act is otherwise imposed by law.

The dissent concedes "an omission to act may create criminal culpability under our Crimes Code even though the law defining the offense, as here, requires an 'act,' where 'a duty to perform the omitted act is otherwise imposed by law.' 18 Pa.C.S. § 301(b)(2)." *Commonwealth v. Cardwell*, 357 Pa.Super. 38, 44, 515 A.2d 311, 314 (1986), *alloc. den.*, 515 Pa. 573, 527 A.2d 535 (1987). Hence, if it is possible to find there was a duty imposed by law, the "simple omission," resulting in death, would result in culpability on the part of appellants.

The majority properly holds section 301 is broad enough to include a contractual undertaking. There is no Pennsylvania case which holds otherwise or requires the stringent interpretation adopted by the dissent. The listing of statutory provisions by the dissent, which includes the term "imposed by law," because they codify duties in many areas of the law, does not thereby limit the application of that term in this instance. Since the legislature has not spelled out its intent, we may look to the common law, the model penal code from which the section was drawn, and to the interpretation of such provisions by courts in other jurisdictions to guide us.

Corpus Juris Secundum states:

> A charge of manslaughter may be predicated on a failure to act as well as on an act, that is to say, a failure to perform a legal duty may form a basis for involuntary manslaughter.

> It is necessary and sufficient that the omission be due to gross or culpable negligence, or recklessness, and such culpable state must have been the proximate cause of the death. The death must have resulted from the neglect of a plain legal duty imposed by law *or contract* on accused personally.

40 C.J.S. HOMICIDE § 92. *Omission to Perform Duty* (footnotes omitted: *see United States v. Bradford,* 344 A.2d 208 (D.C.App.1975); *Smith v. State,* 408 N.E.2d 614 (Ind.App. 1980); *Delay v. Brainard,* 182 Neb. 509, 156 N.W.2d 14 (1968); *State v. Young,* 56 A. 471 (1903); *Davis v. Commonwealth,* 230 Va. 201, 335 S.E.2d 375 (1985); *State v. Benton,* 38 Del. 1, 187 A. 609 (1936)).

61 ALR3d 1207, Homicide by Withholding Necessities, provides:

### § 2. Summary and analysis
### [a] Generally

Generally speaking, in order that a person who withholds food, clothing, or shelter from another may be found criminally liable under general statutes defining murder or manslaughter, it must be shown that (1) such person owed a duty to furnish food, clothing, or shelter; (2) the conduct of such person in not furnishing food, clothing, or shelter was wilful or done with malicious intent, or constituted culpable negligence; and (3) the lack of food, clothing, or shelter was the proximate cause of, or a cause contributing proximately to, the death....

*Id.* (footnotes omitted). While the initial annotation dealt primarily with duties of parents to children, and adults were not included in the consideration, the annotation has been supplemented (1991) by section 5.5, Failure of nonparent to provide food to a dependent adult, which provides:

Evidence was sufficient to support conviction of husband and wife for criminally negligent homicide of husband's mentally retarded and totally dependent adult brother, who died of malnutrition and inflammation of lungs, where decedent did not receive adequate nutrition, weighed 75 pounds at time of death, and had not been taken to see a doctor during last two years of life. *People v. Flayhart* (1988, App Div, 3d Dept) [136 A.D.2d 767] 523 NYS2d 225.

To establish guilt for murder where death results from exposure to freezing weather, there must be a legal *or con-*

*tractual* duty which defendant was bound to perform. *State v. Berry,* 36 N.M. 318, 14 P.2d 434 (1932).

61 ALR3d 1207 § (2)(a) provides:

The question of the nature of the duty to provide food, clothing, or shelter, and its violation, has arisen most frequently in cases involving the parent-and-child relationship, although it also has arisen in a few instances involving husband and wife, as well as in an apparent or alleged guardian-and-child relationship.

*Id.* (footnotes omitted). *See Jones v. United States,* 113 U.S.App.D.C. 352, 308 F.2d 307 (1962) (Jones was convicted of involuntary manslaughter for failure to perform her legal duty of care of an infant). In *Jones,* the appeals court reversed because the trial court had not instructed on the legal duty of care, specifically whether the defendant had entered into a contract with the mother for care of the deceased or alternatively had assumed the care of the infant and secluded him from the care of his mother.

While *Smith, supra,* is not precisely on point it gives guidance as to the efficacy of a contractual obligation or assumption of care to establish legal liability sufficient to charge criminal homicide. Section 5.5 extends this rationale to nonparent-adult.

While Pennsylvania is silent on the precise meaning to be given to the term "duty imposed by law," other states have made such determinations.

Duty imposed by law ... means either duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in reported decisions of the appellate courts of the State or jurisdiction involved.

*Mauldin v. Sheffer,* 113 Ga.App. 874, 880, 150 S.E.2d 150, 154 (1966); *Sutker v. Pennsylvania Insurance Co.,* 115 Ga.App. 648, 651, 155 S.E.2d 694, 698 (1967), *cert. denied.* 22 C.J.S. § 44, footnote 45, states: "Rules governing imposition of duty to render aid or assistance as element of civil negligence are applicable to imposition of duty in context of criminal negli-

gence." *People v. Oliver,* 1 Dist., 210 Cal.App.3d 138, 258 Cal.Rptr. 138, *reh. den.,* review denied (1989).

What makes the contract or assumption of care a duty imposed by law is assumption of a responsibility for the care of a dependent person who thereby loses the protection he would have for being cared for by others with more specific legal responsibility. The history of homicide by omission to provide care primarily is traced through English law and American cases that clearly followed English law. The majority of cases resulting in murder or manslaughter charges involved infants and children, spouses, prison inmates, poor house inmates and sailors. In each of those categories there was a duty of care owed by dominant persons to dependent persons who were subject to the control of the superior persons. These duties were fixed in common law long before any rights were established by statute or made punishable at criminal law. The theory upon which criminal prosecution followed death by omission or callousness is the "depraved heart theory" attributable to a statement made by Lord Campbell in *Regina v. Hughes,* 1857, 7 Cox C.C. 301, 302:

> But it has never been doubted that if death is the directed consequence of the malicious omission of the performance of a duty (as a mother to nourish her infant child) this is a case of murder. If the omission was not malicious and arose from negligence only, it is a case of manslaughter.

*Hughes* involved the death of a workman caused by the failure of a fellow workman to take certain precautions in lowering bricks down a shaft. *Hughes* points out what has been ignored by the dissent. A legal duty may arise in many ways from enumerable relationships with or without contractual or legislative enactments. To require a statute to be enacted to establish the duty is to ignore the evolution of law and the incorporation of common law in the statutory law. If common law is to be eradicated, it must be done so with specific language by the legislative enactment which nullifies it.

In *Gibbins and Proctor,* 1918, 13 Crim.App.Rep. 134, the English court affirmed murder convictions against the father of a seven-year old child and the father's paramour for causing

the child to starve to death. As to the paramour, Proctor, who had undertaken the obligation to provide for the child, the court, quoting from an earlier case of *Instan*, 1893, 1 QB. 450, 17 Cox C.C. 602, declared that Proctor had a legal duty to the child that she "willfully and deliberately left unperformed, with the consequence that there had been an acceleration of the death of the deceased owing to the non-performance of that legal duty" and that a verdict of manslaughter "at least was inevitable." 13 Crim.App.Rep. at 139.

The crime of murder in the third degree in its elements comprehends these timeless concepts of culpability. In describing the element of malice which is necessary to a finding of third degree murder, supplying the specific intent required, our Court has stated: "Malice consists either of an express intent to kill or inflict great bodily harm, or of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, indicating unjustified disregard for the probability of death or great bodily harm." *Commonwealth v. Person*, 345 Pa.Super. 341, 498 A.2d 432 (1985); *Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230 (1981).

The irrationality of the dissent's position is the implication that by entering into a contract appellants are somehow insulated from all the acts and omissions which clearly establish their guilt of third degree murder because the Legislature did not specifically define a contract as creating a duty imposed by law. The only rational interpretation of duty is that the law will find the duty when the duty clearly exists by statute, contract or action of the parties. *See* Model Penal Code § 2.01, Comment 3, N. 30: "The duty imposed by law may be a statutory duty, a contractual duty, or duty arising from tort law." In construing the legislative intent we cannot fail to consider the comments of the Model Penal Code and the guidance provided by common law which it codifies. *Commonwealth v. Heinbaugh*, 467 Pa. 1, 354 A.2d 244 (1976).

The question as proposed by the dissent ignores the quintessential elements of this case which are the active and passive negligence and intentional denial of life-sustaining care

to a dependent elderly person appellants undertook to maintain at the victim's expense. It is not the contract alone which measures the liability but also the callous mistreatment that went beyond the mere failure to fulfill the contract. This contractual failure was exacerbated and made more culpable by the appellants' actions in active concealment of the victim's condition from relatives and medical authorities, thereby preventing him from being saved from incredible suffering and death comparable only to that suffered by persons incarcerated in German, Russian and Japanese death camps during World War II. If appellants are insulated from liability in the death of the victim in this case because he entered their care voluntarily or by agreement, many thousands of Jewish men, women and children who believed they entered camps in Europe to be cared for pending relocation, have suffered their unspeakable degradation, pain and death in vain.

Society can best be measured by the manner in which it treats its elderly and its children. In this case, treatment of 92-year old Joseph Kly was so far below any acceptable standard of reasonable care by persons owing a duty of care that to ignore their behavior is to repudiate the laws of society and to return to the law of nature. We can be punished for throwing trash on a sidewalk yet may suffer no penalty for discarding a human life by denying him sustenance and deliberately causing his death. The trial court gave a carefully, thought out and well-worded instruction on creation of a legal duty by means of an oral or implied contract. Coupled with the evidence of deliberate life-threatening abuse and neglect as we understand those terms today, the jury properly and without any other reasonable choice concluded the elements of third degree murder were established beyond a reasonable doubt by the Commonwealth.

OLSZEWSKI, J., joins concurring opinion by TAMILIA, J.

McEWEN, Judge, dissenting:

The author of the majority opinion has, in his customary fashion, provided so persuasive an expression of view upon this trying issue that one can hardly be resolute in dissent,

particularly since I wholeheartedly concur with the conclusion of the majority that there is ample evidence upon which to sustain the homicide convictions of appellants. Nonetheless, I must respectfully depart the company of my eminent colleagues who find that the trial court properly instructed the jury that the failure to perform a civil contract, though simple omission *alone,* is sufficient to meet the voluntary act requirements of Section 301 of the Crimes Code.

The majority quite correctly observes that "appellants' culpable conduct, according to the evidence, was *not* limited merely to an omission to act. It consisted, rather, of an affirmative course of conduct calculated to deprive Kly of the food and medical care which was otherwise available to him and which was essential to continued life. It included efforts to place Kly beyond the ability of others to provide such needs." Thus, while I would grant appellants a new trial, it is to be emphasized as certain and sure that appellants are not entitled to an arrest of judgment since a reading of even the limited portions of the record available to this Court discloses sufficient evidence to support a finding by the jury that appellants' omission (failure to perform the contract) would not have resulted in the death of Joseph Kly except for the *voluntary acts* of the appellants, including the removal of their victim, Joseph Kly, to a remote area of Scott Township where he did not have access to a phone, store, or friends, and the *active concealment of his whereabouts* from those who might otherwise have assisted him. *Cf. Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889 (1974); *Commonwealth v. Smith,* 389 Pa.Super. 606, 610, 567 A.2d 1070, 1072 (1989); *Commonwealth v. Kominsky,* 240 Pa.Super. 532, 361 A.2d 794 (1976).

Section 301(b) is by its very terms applicable *only* where the basis of responsibility is "an omission *unaccompanied by action....*" 18 Pa.C.S. § 301(b). Since my reading of the record reveals ample evidence of intentional *acts,* if not for the charge of the court, I would find that the provisions of Section 301 of the Crimes Code present no obstacle to the conviction of appellants for the offenses charged including criminal homi-

cide. *See and compare: Commonwealth v. Smith, supra* at 610, 567 A.2d at 1072.

The attorney for the Commonwealth, however, while relating in his brief to this Court that appellants "not only . . . fail[ed] to provide Mr. Kly with proper care, food and shelter they had agreed to, but, additionally, they took *deliberate steps* to prevent others from doing so", presumably deemed it strategically prudent to refrain in the trial court from arguing that those deliberate acts were sufficient to establish liability for criminal homicide and thereby render the provisions of Section 301(b)(2) irrelevant in this prosecution. *See and compare: Commonwealth v. Skufca, supra; Commonwealth v. Youngkin,* 285 Pa.Super. 417, 427 A.2d 1356 (1981). As a result, one of the issues which this Court must now decide is whether appellants are correct when they argue that the charge to the jury contained error since Pennsylvania law does not permit a finding that a breach, by omission, of a civil contract will suffice as an "act" for purposes of criminal liability where the duty to act arises only by virtue of the contract and not under a statute or other ordinance or regulation. After intense and concerned reflection, I find myself obliged to agree that the trial court erred when it instructed the jury that appellants could be found guilty of criminal homicide based solely upon a finding of a breach by omission of an oral contract.

The theory of the Commonwealth at trial was that the failure of appellants to fulfill the alleged civil contract to provide food, shelter, personal and medical care to Mr. Kly was *alone* sufficient to support a finding of first and/or third degree murder.[1]

---

1. Although a detailed Request for Bill of Particulars was timely filed by appellants, no reply is contained in the record nor does the docket reflect that the Commonwealth ever filed a response. The Commonwealth charged, in the informations filed against appellants, that they, *inter alia:*

 "did unlawfully and feloniously kill and slay one Joseph J. Kly, age 92 years old, with malice"

 in violation of 18 Pa.C.S. § 2503(c); and

Section 301(b)(2) of the Crimes Code provides, in relevant part:

Liability for the commission of any offense may not be based on an *omission unaccompanied by action* unless . . . a duty to perform the omitted act is otherwise *imposed by law.* (Emphasis added).

18 Pa.C.S. § 301(b)(2).

"An omission to act may create criminal culpability under our Crimes Code even though the law defining the offense, as here, requires an 'act' where 'a duty to perform the omitted act is otherwise imposed by law.' 18 Pa.C.S. § 301(b)(2)." *Commonwealth v. Cardwell,* 357 Pa.Super. 38, 44, 515 A.2d 311, 314 (1986), *allo. denied,* 515 Pa. 573, 527 A.2d 535 (1987). The precise issue thus becomes whether the legislature intended that a "contractual duty" constitutes a "duty imposed by law" for purposes of ascertaining whether conduct is criminal. While I share the desire of the prosecutor and the jury that appellants must not escape responsibility for their horribly inhuman and criminally culpable conduct, I cling to the view that an appellate court is not free to reshape the intention or revise the language of the Crimes Code. Rather, our constitutional obligation is to implement the intent and comply with the direction of the legislature.

While the Attorney General argues that a finding of criminal responsibility based upon a breach of a contractual duty would be "consistent with principles established in common law," our legislature has, with the enactment of the Crimes Code, abolished common law crimes, 18 Pa.C.S. § 107(b), and

"did cause the death of one Joseph J. Kly, age 92 years old, as a direct result of the doing of an *unlawful act* in a reckless and grossly negligent manner" (emphasis supplied)

in violation of 18 Pa.C.S. § 2504; and

"did recklessly engage in conduct which placed and may have placed another person in danger of death and serious bodily injury in that [they] did fail to provide Joseph J. Kly, a person entrusted to [their] care and control, with adequate life sustaining food, liquids, medicine, nourishment, clothing, and care which resulted in the death of the said Joseph J. Kly"

in violation of 18 Pa.C.S. § 2705.

evidenced as well a departure from reliance upon principles of common law in the Crimes Code.

Nor do I find support in Pennsylvania case law for this argument advanced by the Commonwealth. It is true that this Court has upheld convictions for endangering the welfare of children, 18 Pa.C.S. § 4304, in at least four instances based upon a knowing violation by omission of a parent's duty of care for a minor child. *See: Commonwealth v. Cardwell, supra; Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616 (1985); *Commonwealth v. Morrison*, 265 Pa.Super. 363, 401 A.2d 1348 (1979); *Commonwealth v. Humphreys*, 267 Pa.Super. 318, 406 A.2d 1060 (1979). Similarly, this Court in *Commonwealth v. Howard*, 265 Pa.Super. 535, 402 A.2d 674 (1979) upheld the involuntary manslaughter conviction of a mother who had failed to protect her child from physical abuse inflicted by the mother's paramour. However, all of the cases which our research has yielded involved, where liability is based upon a failure to act, the parent-child relationship and the statutory imposition of duties upon the parents of minors. Moreover, our Supreme Court in *Commonwealth v. Konz*, 498 Pa. 639, 450 A.2d 638 (1982), while acknowledging that an omission is alone sufficient where "there exists a requisite status of relationship between the parties, as is present in the relationship of parent to child," *Id.* at 644, 450 A.2d at 641, reversed this Court and discharged the defendant wife who had been convicted of involuntary manslaughter in connection with the death of her husband. The Supreme Court discharged the defendant wife after rejecting "the holding of the Superior Court that the marital relationship gives rise to an unrestricted duty for one spouse to summon medical aid whenever the other is in a serious or immediate need of medical attention." *Commonwealth v. Konz, supra* at 644, 450 A.2d at 641. In the instant case, where there was no "status of relationship between the parties" except landlord/tenant, a failure to perform a civil contract cannot *alone* sustain a conviction for third degree murder.

While a minority of other jurisdictions have sustained convictions for involuntary manslaughter under similar circum-

stances, *see: State v. Brown,* 129 Ariz. 347, 631 P.2d 129 (1981); *Davis v. Commonwealth,* 230 Va. 201, 335 S.E.2d 375 (1985), *Anno,* Homicide by withholding food, clothing or shelter, 61 ALR3d 1207 (1975), the function of this Court is to interpret and apply the provisions of the criminal law in accordance with the intent of the legislature of Pennsylvania. My review of case law from this and other jurisdictions as well as our legislature's use of the phrase in other sections of the Crimes Code [2] and in a number of other statutes [3] has persuaded me that the legislature, in employing the phrase "imposed by law", intended that the phrase denote duties specifically imposed by a statute, ordinance or administrative regulation, and not duties voluntarily assumed by private individuals.

Thus, it is that I dissent.

DEL SOLE, Judge, dissenting.

I join the Dissenting Opinion of Judge McEwen. I believe that the Majority and Concurring Opinions error by equating "legal duty" with a "duty imposed by law." Resolution of the instant case is controlled by the definition of the phrase "a duty imposed by law." I believe that this phrase, as it appears in 18 Pa.C.S.A. § 301(b)(2), encompasses only those duties which are imposed by statute or regulation and specifically does not include a contractual obligation.

A criminal action was brought against the Pestinikases charging that they failed to provide adequate life sustaining food, liquids, medicine, nourishment, clothing and care to Joseph J. Kly, who was entrusted to their care. As a result, Mr. Kly met his death at the age of 92. It was the Commonwealth's position at trial that the Pestinikases breached a

2. 18 Pa.C.S. § 102(a)(5); 18 Pa.C.S. § 303(d); 18 Pa.C.S. § 307(1)(2); 18 Pa.C.S. § 307(c)(2).

3. Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, No. 164, § 205, *as amended,* 71 P.S. § 732–205(d); Act of April 9, 1929, P.L. 177, art. VIII, § 803, 71 P.S. § 273; Act of July 15, 1957, P.L. 901, § 303, *as amended,* 53 P.S. § 41303(2); The Act of June 23, 1931, P.L. 932, art. XVII, § 1708, *as amended,* 53 P.S. § 36707; The Act of June 13, 1967, P.L. ——, No. 21, art. 3, § 323, 62 P.S. § 323; The Act of June 3, 1937, P.L. 1333, art. II, § 201, 25 P.S. § 2621(f).

contractual duty by their failure to perform certain acts in caring for Mr. Kly, which formed the basis for their criminal liability. The trial court charged the jury that the law imposes criminal responsibility for the failure to perform an act if it is found that there exists a "legal duty to care" for another. N.T. 2/10/87 at 54. The jury was instructed to "first determine whether or not an oral contract to care for Joseph Kly was entered into between Joseph Kly and the defendant." In judging the defendants' guilt the jury was asked to determine whether the Pestinikases "owed Mr. Kly a legal duty of care by virtue of a contract," whether the terms were clearly understood, whether the Pestinikases were able, but failed to perform the duties of care, and whether this omission was the direct cause of Mr. Kly's death. *Id.* at 57.

Generally to be convicted of a crime the performance of a voluntary act is necessary, but an omission may be a basis for criminal liability in certain situations. *Commonwealth v. Smith,* 264 Pa.Super. 303, 399 A.2d 788 (1979). The general rule is set forth in 18 Pa.C.S.A. § 301 which provides:

### § 301. Requirement of voluntary act

(a) **General rule.**—A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act of which he is physically capable.

(b) **Omission as basis of liability.**—Liability for the commission of an offense may not be based on an omission unaccompanied by action unless:

(1) the omission is expressly made sufficient by the law defining the offense; or

(2) a duty to perform the omitted act is otherwise imposed by law.

Since the crimes charged did not include in their definitions an omission as one of their basic elements, the trial court instructed the jury that guilt could be found based upon an omission as described in § 301(b)(2). The jury was charged that the duty to perform the omitted act may be imposed by law where it is based upon a contractual agreement. The court instructed the jury that "unless you find beyond a

reasonable doubt that an oral contract imposed a duty to act upon Walter and Helen Pestinikas, you must acquit the defendants." *Id.* at 55. I find that such an instruction was in error.

Duties which are "imposed by law" do not encompass those which arise out of a contract or agreement. A person who enters a contract does so freely. The duties contained in a contract are those which the person who is entering the contract agrees to undertake voluntarily in exchange for some other consideration. The duties themselves are not "imposed by law" they are assumed by the terms of the agreement. Although breach of the agreement may result in some legal recourse, the law will fashion a remedy only if the injured party seeks one. The Pestinikases' omissions which resulted in a breach of their agreement to care for Mr. Kly do not constitute an omission which could be the basis of liability under § 301(b)(2).

The term "imposed by law" appears more that 50 times in the Pennsylvania statutes. I have found none which would suggest that a "duty imposed by law" is one which can arise out of a contract. Interestingly enough, the term even appears in the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, No. 164, § 205, *as amended*, 71 P.S. § 732–205(d), which provides:

> (d) *Powers when prosecuting.* Whenever the Attorney General prosecutes a criminal action, or appeal, he may employ such special deputies as are necessary for that purpose; such deputies shall take the oath of office and be clothed with all the powers, and subject to all the liabilities *imposed by law* upon district attorneys, including the power to sign informations or indictments. Whenever the Attorney General intervenes in a criminal action, the costs incurred as a result of the intervention shall be paid by the Commonwealth.

71 P.S. § 732–205(d) (emphasis added). Surely the Attorney General would concede that the legislature did not intend by this statute to impose the provisions of the common law upon special deputies of the Attorney General.

The legislature has employed the term "imposed by law" in the following provisions of the Crimes Code:

Section 102 of the Crimes Code, 18 Pa.C.S. § 102(a)(5) (*"Territorial applicability*—... a person may be convicted under the law of this Commonwealth ... if ... the offense consists of the omission to perform a legal duty *imposed by the law* of this Commonwealth with respect to domicile, residence or a relationship to a person, thing or transaction in this Commonwealth ..." (emphasis supplied));

Section 303 of the Crimes Code, 18 Pa.C.S. § 303(d) (*"Absolute liability*—When causing a particular result is a material element of an offense for which absolute liability is *imposed by law,* the element is not established, unless the actual result is a probable consequence of the conduct of the actor." (emphasis supplied));

Section 307(a) of the Crimes Code, 18 Pa.C.S. § 307(a)(2) ("A corporation may be convicted of the commission of an offense if ... the offense consists of an omission to discharge a specific duty of affirmative performance *imposed on corporations by law* ..." (emphasis supplied)); and Section 307(c) of the Crimes Code, 18 Pa.C.S. § 307(c)(2) ("An unincorporated association may be convicted of the commission of an offense if ... the offense consists of an omission to discharge a specific duty of affirmative performance *imposed on associations by law.*" (emphasis supplied)). *See also*: 18 Pa.C.S. § 307(B)(2).

Similarly, the use by the legislature of the phrase "imposed by law" in other Pennsylvania statutes suggests that the legislature intended the word "law" to refer only to duly enacted statutes, ordinances or administrative regulations. *See, e.g.*:

The Act of April 9, 1929, P.L. 177, art. VII, § 706, *as amended,* 71 P.S. § 246(b) ("In addition to any other duties *imposed by law,* the Auditor General shall, on a quadrennial basis, conduct a financial audit and a compliance audit of the affairs and activities of the Pennsylvania Turnpike Commission." (emphasis supplied));

The Act of April 9, 1929, P.L. 177, art. VIII, § 803, 71 P.S. § 273 ("The Department of State shall have the power, and its duty shall be, to care for, compile, publish, and certify, returns of elections, in all cases in which such duties shall heretofore have been *imposed by law* upon the Department of the Secretary of the Commonwealth, the Department of State and Finance, or the Department of State." (emphasis added));

The Act of April 9, 1929, P.L. 177, art. VII, § 710, *as amended,* 71 P.S. § 250 ("The Pennsylvania State Police shall have the power and its duty shall be ... to collect information relating to crimes and incidents related to the race, color, religion or national origin of individuals ... information ... collected in accordance with this subsection shall be available for use by any agency required to furnish information, to the extent that such information is reasonably necessary or useful to such agency in carrying out the duties *imposed* on it *by law* ...." (emphasis supplied));

The Act of July 15, 1957, P.L. 901, § 303, *as amended,* 53 P.S. § 41303(2) ("Each city governed by an optional form of government pursuant to this act shall, subject to the provisions of and limitations prescribed by this act, have full power to ... construct, acquire, operate or maintain any and all public improvements, projects or enterprises for any public purpose, subject to referendum requirements otherwise *imposed by law,* and to exercise all powers of local government in such manner as its governing body may determine." (emphasis supplied));

The Act of June 23, 1931, P.L. 932, Art. XVII, § 1708, *as amended,* 53 P.S. § 36707 ("The city controller may appoint a deputy controller, who in case of the sickness, absence, or inability of such controller to act, shall have the same powers and shall perform the same duties as are *imposed by law* upon the city controller." (emphasis added));

The Act of June 13, 1967, P.L. ——, No. 21, art. 3, § 321, 62 P.S. § 323 ("The State general hospitals are declared to be hospitals for the care and treatment of the ill, without any restrictions other than those now or hereafter *imposed by*

*law* upon all general hospitals, and except as each individual institution is restricted by the limitations of its facilities and equipment." (emphasis added)); and

The Act of June 3, 1937, P.L. 1333, art. II, § 201, 25 P.S. § 2621(f) ("To receive from county boards of elections the returns of primaries and elections, to canvass and compute the votes cast for candidates and upon questions as required by the provisions of this act; to proclaim the results of such primaries and elections, and to issue certificates of election to the successful candidates at such elections, except in cases where that duty is *imposed by law* on another officer or board." (emphasis added)).

Examination of this language indicates that obligations which arise from a contract are distinct from those which are imposed by law. In contrast to the wording found in § 301(b)(2) is the broader language used in 18 Pa.C.S.A. § 3927. Instead of referring to "duties imposed by law," this provision, which concerns theft by failure to make required disposition of funds, contains the term "any legal obligation". The decision of the General Assembly to utilize the more narrow term "duties imposed by law" in § 301(b)(2) must be considered intentional and in construing this provision this court must assume that the legislature intended every word of this statute to have effect. *Commonwealth v. Hill,* 481 Pa. 37, 391 A.2d 1303 (1978).

I am concerned that the position argued by the Commonwealth in this case would subject those parties who breach a contract to criminal responsibility even though no specific crime involving their actions has been defined by the legislature. These concerns require us to remain mindful that a penal statute such as that found in the instant case should be strictly construed in favor of the defendant. *Commonwealth v. Darush,* 256 Pa.Super. 344, 389 A.2d 1156 (1978). The strict construction rule regarding penal statutes is based on the rationale that it would be unjust to convict a person without clear notice that the contemplated conduct is unlawful, as well as providing that individual with notice of the potential penalties. *Commonwealth v. Broughton,* 257 Pa.Super. 369,

390 A.2d 1282 (1978). This rationale provides sound reasoning for the conclusion that the term "duties imposed by law" does not encompass those duties contained in a contract. This term does not imply that an individual who fails to perform a contract may, as a result of that failure to perform, be subject to criminal liability. However, the duty to perform the omitted act must be contained in a statute or regulation. Such duties which are pronounced in statutes and regulations are those "imposed by law."

Unfortunately at the time of Mr. Kly's death there were no statutes or regulations governing the Pestinikases' conduct. Some measure of protection for the elderly in this Commonwealth is now offered in the Older Adults Protective Services Act, 35 P.S. § 10211 et. seq., which became effective July 1, 1988. This Commonwealth has through statutory provisions also sought to protect minors who are under the care of another. See: Child Protection Services Law, 11 P.S. § 2201 et. seq.; Adoption Act, 23 Pa.C.S.A. § 2102 et. seq.; Juvenile Act, 42 PA.C.S.A. § 6301. In fact the relationship of parent and child has been found to be one which requires affirmative performance, and based upon this relationship a parent may be held liable for omitted acts under § 301(b)(2). Commonwealth v. Howard, 265 Pa.Super. 535, 402 A.2d 674 (1979). However this concept has not been expanded to the spousal relationship. In Commonwealth v. Konz, 498 Pa. 639, 450 A.2d 638 (1982) the court ruled that an individual does not have an unrestricted duty to summon medical aid whenever their spouse is in serious or immediate need of medical attention.

Although the question presented in this case has not been presented before in this Commonwealth, other jurisdictions have considered and ruled on cases involving analogous fact situations. People v. Montecino, 66 Cal.App.2d 85, 152 P.2d 5 (1944) (where defendant's failure to care for an elderly woman as agreed caused her death, the defendants conviction of involuntary manslaughter was upheld); State v. Brown, 129 Ariz. 347, 631 P.2d 129 (1981) (where it was held that the evidence was sufficient to sustain the defendant's conviction

for manslaughter in the starvation death of his boarder); and *Davis v. Commonwealth*, 230 Va. 201, 335 S.E.2d 375 (1985) (where court affirmed a daughter's conviction for involuntary manslaughter in the death of her mother by failing to provide her with heat, food, liquids and other necessities.)

The case of *People v. Montecino, supra*, is cited in the Model Penal Code, Article 2, Section 2.01 at Comment 3, n. 30, in reference to an occasion where a "duty imposed by law" was said to arise from a "contractual duty." In *Montecino* the court found that the defendant was "under a legal duty imposed by contract to care for [the deceased]." 152 P.2d at 13. In the case before us I too agree that the jury was free to find that the Pestinikases were "under a legal duty imposed by contract" to care for Mr. Kly. However as I have stated, a "legal duty" which is "imposed by contract" is not a "duty imposed by law" because the contractual duty is voluntarily undertaken and its breach is not, in itself, criminal. This distinction between the terms "legal duty" and "duty imposed by law" is evident in a reading of *Montecino*. Therein the court, citing to 29 C.J. 1159, notes that one may be chargeable for the care of another where the defendant was "under a legal duty imposed *either* by law *or* contract to care." *Id.* (emphasis added.)

In *Davis v. Commonwealth, supra*, the court was seeking to determine whether the daughter "was under a legal duty to care for her mother." 335 S.E.2d at 378. The court remarked that "when a death results from an omission to perform a *legal duty*, the person obligated to perform the duty may be guilty of culpable homicide." *Id.* (emphasis added.) It also noted that "a legal duty is one either 'imposed by law, or by contract'." *Id. citing Pierce v. Commonwealth*, 135 Va. 635, 651, 115 S.E. 686, 691 (1923). Thus, a "duty imposed by law" is not synonymous with a "contractual duty." Although both a "duty imposed by law" and a "contractual duty" are "legal duties" the two are not equivalent. The statute we are asked to interpret speaks only to "duties imposed by law", the broader term "legal duty" is not present.

414

In *State v. Brown, supra,* the court was considering a statute similar to that found in this Commonwealth. The statute involved provided: "The minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform a *duty imposed by law* which the person is physically capable of performing." 631 P.2d at 131, *citing* A.R.S. Sec. 13–201. Referring to this statute the court noted that the failure to perform a duty imposed by law may create criminal liability. It stated: "In the case of negligent homicide or manslaughter, the duty must be found outside the definition of the crime itself, perhaps in another statute, or in common law or in a contract." *Id.* First, I note that in this Commonwealth, common law crimes have been abolished. 18 Pa.C.S.A. § 107 states: "No conduct constitutes a crime unless it is a crime under this title or another statute of this Commonwealth." Secondly, while I agree that the duty may arise from a statute other than the criminal statute involved, I cannot agree with the *Brown* court's reasoning that this duty can arise from a contract.

With regard to contracts being a basis for criminal liability note that the *Brown* court referred to *People v. Beardsley,* 150 Mich. 206, 113 N.W. 1128 (1907). The following passage was quoted:

"The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with man-slaughter.... This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law *or* by contract, and the omission to perform the duty must be the immediate and direct cause of death." (citations omitted) 113 N.W. at 1129.

*State v. Brown,* 631 P.2d at 131. (emphasis added.) The *Beardsley* court, as the courts in *Montecino* and *Davis,* was not concerned with a statutory interpretation of the phrase "duty imposed by law." Instead the court was defining legal

duty, and included as a part of that definition those duties "imposed by law" and other duties which are "imposed by contract."

Because the statute we are asked to examine, which must be strictly construed, refers solely to "duties imposed by law," and because a contractual duty alone is not one "imposed by law," I join the dissent of Judge McEwen.

McEWEN, J., joins.